# 24-0519-cv

# United States Court of Appeals

*for the*

# Second Circuit

———————————

LIA TIEU,

*Plaintiff-Appellant,*

— v. —

NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION,
WINTHROP HOYT, in his individual and professional capacities,
RACHEL LOEB, in her individual and professional capacities,

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

VALDI LICUL
WIGDOR LLP
*Attorneys for Plaintiff-Appellant*
85 Fifth Avenue, 5th Floor
New York, New York 10003
(212) 257-6800

CP COUNSEL PRESS    (800) 4-APPEAL • (328654)

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ............................................................1

JURISDICTIONAL STATEMENT .......................................................2

ISSUES PRESENTED..........................................................................2

STATEMENT OF THE CASE...............................................................3

I.     BACKGROUND .......................................................................3

II.    TIEU'S LEAVE AND ACCOMMODATION REQUESTS.........................3

III.   TIEU'S CONTINUED PROTECTED COMPLAINTS OF

       DISCRIMINATION .................................................................6

IV.    TIEU'S REQUEST FOR DISABILITY LEAVE ...........................8

V.     EDC SUMMARILY DISMISSES TIEU'S COMPLAINTS AND
       CONTINUES HOSTILITY AGAINST HER ...............................11

VI.    TIEU RETURNS TO WORK AND FACES CONTINUED
       DISCRIMINATION AND RETALIATION ..................................12

VII.   RACE AND SEX DISCRIMINATION DEMONSTRABLE BY
       CONDUCT TOWARDS OTHERS ............................................14

VIII.  PROCEDURAL HISTORY .......................................................16

SUMMARY OF ARGUMENT ...........................................................17

ARGUMENT ...................................................................................20

I.     THE SUMMARY JUDGMENT STANDARD .............................20

II.    FMLA ....................................................................................22

A. Interference ....................................................................................23

B. Retaliation......................................................................................30

    1. Timing ......................................................................................33

    2. Comments................................................................................37

    3. Pretext.....................................................................................39

    4. Investigation ..........................................................................40

III.    PREGNANCY DISCRIMINATION ....................................................41

IV.    RACE AND SEX DISCRIMINATION ...............................................43

V.    RETALIATION..................................................................................47

CONCLUSION ...........................................................................................51

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                <u>Page(s)</u>

<u>Aiello v. Stamford Hosp.</u>,
   487 Fed. App'x 677 (2d Cir. 2012)......................................................29

<u>Alvarado v. United Hospice, Inc.</u>,
   631 F. Supp. 3d 89 (S.D.N.Y. 2022).....................................................49

<u>Back v. Hastings On Hudson Union Free Sch. Dist.</u>,
   365 F.3d 107 (2d Cir. 2004)........................................................... 42, 46

<u>Banks v. Gen. Motors, LLC</u>,
   81 F.4th 242 (2d Cir. 2023)............................................................ 20, 25

<u>Bart v. Golub Corp.</u>,
   96 F.4th 566 (2d Cir. 2024)........................................................... passim

<u>Billue v. Praxair, Inc.</u>,
   No.CIV.A 305CV00170CH,  2007 WL 1231841 (D. Conn. Apr. 26, 2007)........33

<u>Bond v. Sterling, Inc.</u>,
   997 F. Supp. 306 (N.D.N.Y. 1998) ......................................................41

<u>Bostock v. Clayton Cty.</u>,
   140 S. Ct. 1731 (2020).........................................................................43

<u>Briggs v. Women in Need, Inc.</u>,
   819 F. Supp. 2d 119 (E.D.N.Y. 2011) ..................................................41

<u>Byrnie v. Town of Cromwell, Bd. Of Educ.</u>,
   243 F.3d 93 (2d Cir. 2001)...................................................................21

<u>Carter v. Syracuse City School Dist.</u>,
   850 Fed. App'x 22 (2d Cir. 2021).........................................................22

<u>Chertkova v. Connecticut Gen. Life. Ins. Co.</u>,
   92 F.3d 81 (2d Cir. 1996) ....................................................................26

Comcast Corp. v. Nat'l Ass'n of African American-Owned Media,
140 S. Ct. 1009 (2020)...........................................................43

Cronin v. Aetna Life Ins. Co,
46 F.3d 196, (2d Cir. 1995)...................................................36

Danzer v. Norden Systems, Inc.,
151 F.3d 50 (2d Cir. 1998)....................................................22

Di Giovanna v. Beth Israel Med. Ctr.,
651 F. Supp. 2d 193 (S.D.N.Y. 2009)........................... 24, 27

Dixon v. Int'l Fed'n of Accountants,
416 F. App'x 107 (2d Cir. 2010)............................................46

Dodd v. City University of New York,
489 F. Supp. 3d 219 (S.D.N.Y. 2020)....................................48

Doe v. Columbia Univ.,
831 F. 3d 46 (2d Cir. 2016)...................................................41

Donnelly v. Greenburgh Cent. Sch. Dist, No. 7,
691 F.3d 134 (2d Cir. 2012)..................................................33

Fields v. N.Y. State Off. of Mental Retardation & Developmental Disabilities,
115 F.3d 116, 120 (2d Cir. 1997)..........................................31

Friedman v. Swiss Re America Holding Corp.,
643 F. App'x 69  (2d Cir. 2016)............................................21

Golden v. New York City Dept. of Environmental Protection,
No. 06-CIV 1587(DLC), 2007 WL 4258241 (S.D.N.Y. 2007) ...........................29

Gorzynski v. JetBlue Airways Corp.,
596 F.3d 93 (2d Cir. 2010)............................................. 21, 44

Graziadio v. Culinary Inst. Of Am.,
817 F.3d 415 (2d Cir. 2016)........................... 23, 30, 31, 39

iv

Green v. Town of East Haven,
  952 F.3d 394 (2d Cir. 2020)..................................................................20

Gross v. FBL Financial Services, Inc.,
  557 U.S. 167 (2009) .........................................................................37

Halbrook v. Reichhold Chemicals, Inc.,
  735 F. Supp. 121 (S.D.N.Y. 1990)..................................................26

Henry v. Wyeth Pharms., Inc.,
  616 F.3d 134 (2d Cir. 2010)..............................................................31

Hicks v. Baines,
  593 F.3d 159 (2d Cir. 2010)..............................................................48

Hill v. City of New York,
  136 F. Supp. 3d 304 (E.D.N.Y. 2015)..............................................23

Hockenjos v. Metro Trans Auth.,
  No. 14 Civ. 1679, 2015 WL 2903269 (S.D.N.Y. May 18, 2016) ........42

Holcomb v. Iona Coll.,
  521 F.3d 130 (2d Cir. 2008)..............................................................42

Holtz v. Rockefeller & Co.,
  258 F.3d 62 (2d. Cir. 2001)..............................................................31

Horning v. Trustees of Columbia Univ. in City of New York,
  No. 17 Civ. 3602 (ER), 2022 WL 976267 (S.D.N.Y. Mar. 31, 2022) ..............32

Ibrahim v. Fid. Brokerage Servs., LLC,
  No. 19-CV-3821 (VEC), 2020 WL 107104 (S.D.N.Y. Jan. 9, 2020)..............26

In re Dana Corp.,
  574 F.3d 129 (2d Cir. 2009)..............................................................22

Interdonato v. Bae Sys., Inc.,
  16 Fed. App'x 25 (2d Cir. 2001)..........................................................26

Johnson v. City of New York,
   No. 18 Civ. 9600, 2020 WL 2036708 (S.D.N.Y. Apr. 28, 2020).................. 45, 46

Kaytor v. Elec. Boat Corp.,
   609 F.3d 537 (2d Cir. 2010)..................................................................21

Kessler v. Westchester Cnty. Dep't of Soc. Servs.,
   461 F.3d 199 (2d Cir. 2006)..................................................................20

Koppar v. Orange Reg. Med. Ctr.,
   No. 19 Civ. 112288, 2022 WL 348172 (S.D.N.Y. Feb. 2, 2022) ........................41

Kurtanideze v. Mizuho Bank,
   No. 23 Civ. 8716 (PAE), 2024 WL 1117180 (S.D.N.Y. Mar. 23, 2024) .............29

Kwon v. Univ. of Vermont and State Agricultural College,
   912 F. Supp. 2d 135 (D. Vt. 2012) ........................................................44

Laudadio v. Johanns,
   677 F. Supp. 2d 590 (E.D.N.Y. 2010)....................................................33

Limauro v. Consol. Edison Co. of New York, Inc.,
   No. 20-CV-03558 (CM), 2021 WL 466952 (S.D.N.Y. Feb. 9, 2021) .................48

Littlejohn v. City of New York,
   795 F.3d 297 (2d Cir. 2015)..................................................................47

Mack v. Otis Elevator Co.,
   326 F.3d 116 (2d Cir. 2003)..................................................................33

Magilton v. Tocco,
   379 F. Supp. 2d 495 (S.D.N.Y. 2005)....................................................36

Menaker v. Hofstra Univ.,
   935 F.3d 20 (2d Cir. 2019)............................................................... 40, 41

Mihalik v. Credit Agricole Cheuvreux North America, Inc.,
   715 F.3d 102 (2d Cir. 2013)..................................................................47

Millea v. Metro-N. R. Co.,
     658 F.3d 154 (2d Cir. 2011)....................................................................30

Muldrow v. City of St. Louis, Missouri,
     601 U.S. ---, 144 S. Ct. 967 (2024) .................................................. 49, 50

NML Capital, Ltd. v. Republic of Argentina,
     No. 05 Civ. 2434 (TPG), 2009 WL 1528535 (S.D.N.Y. May 29, 2009)....... 29, 32

Patrick v. LeFevre,
     745 F.2d 153 (2d Cir. 1984)............................................................ 21, 22

Petrisch v. JP Morgan Chase,
     789 F. Supp. 3d 437 (S.D.N.Y. Jan. 11, 2011)........................................40

Piligian v. Icahn Sch. of Med. at Mount Sinai,
     490 F. Supp. 3d 707 (S.D.N.Y. 2020)...................................................48

Price Waterhouse v. Hopkins,
     490 U.S. 228 (1989) ........................................................................45

Rasmy v. Marriott Int'l., Inc.,
     952 F.3d 379 (2d Cir. 2020)................................................... 21, 25, 28

Redd v. N.Y. Div. of Parole,
     678 F.3d 166 (2d Cir. 2012)...............................................................20

Reeves v. Sanderson Plumbing Prods., Inc.,
     530 U.S. 133 (2000) ........................................................................22

Reilly v. Revlon,
     620 F. Supp. 2d 524 (S.D.N.Y. 2009)..................................................27

Robertson v. Wells Fargo Bank, N.A.,
     No. 3:14 Civ. 01861 (VLB), 2017 WL 326317 (D. Conn. Jan. 23, 2017)...........44

Rodriguez v. Vill. Green Realty, Inc.,
     788 F.3d 31 (2d Cir. 2015)................................................................21

Rule v. Brine, Inc.,
    85 F.3d 1002 (2d Cir. 1996) ...................................................................22

Santiago v. Dep't of Transp.,
    50 F. Supp. 3d 136 (D. Conn. 2014) ............................................ 23, 25

Saraf v. West Publishing Corp.,
    No. 16-CV-1425 (VSB), 2018 WL 7107266 (S.D.N.Y. Dec. 20, 2018) . 24, 33, 35

Stratton v. Dep't for the Aging for the City of N.Y.,
    132 F.3d 869 (2d Cir. 1997) ...................................................................39

Summa v. Hofstra Univ.,
    708 F.3d 115 (2d Cir. 2013) ...................................................................36

Tieu v. New York City Economic Dev. Corp.,
    --- F. Supp. 3d ---, 2024 WL 580063 (S.D.N.Y. 2024) ................................ passim

Tolbert v. Smith,
    790 F.3d 427 (2d Cir. 2015) ...................................................................37

Tomassi v. Insignia Fin. Grp., Inc.,
    478 F.3d 111 (2d Cir. 2007) ............................................................ 37, 46

Treglia v. Town of Manlius,
    313 F.3d 713 (2d Cir. 2002) ...................................................................35

Triodetic, Inc. v. Statue of Liberty IV,
    582 Fed. App'x 39 (2d Cir. 2014) ...........................................................29

Vega v. Hempstead Union Free Sch. Dist.,
    801 F.3d 72 (2d Cir. 2015) ............................................................. 25, 43

Walsh v. New York City Housing Auth.,
    828 F.3d 70 (2d Cir. 2016) ........................................................ 21, 25, 26

Woods v. START Treatment & Recovery Centers, Inc.,
    864 F.3d 158 (2d Cir. 2017) ......................................................... 23, 31

Ya-Chen Chen v. City Univ. of New York,
   805 F.3d 59 (2d Cir. 2015)............................................................ 32, 36

Zann Kwan v. Andalex Grp. LLC,
   737 F.3d 834 (2d Cir. 2013)........................................................... 37, 48

Zubulake v. UBS Warburg LLC,
   382 F. Supp. 2d 536 (S.D.N.Y. 2005)...................................................47

Statutes

29 U.S.C. § 612 ..............................................................................23

28 U.S.C. §§ 1331 and 1343 ..................................................................2

29 U. S.C. § 2614 ...........................................................................23

29 U.S.C. § 2615 .........................................................................1, 30

42 U.S.C. § 1981 ...................................................................... 1, 2, 43

42 U.S.C. §§ 2000 ......................................................................1, 43

42 U.S.C. §§ 12101 ........................................................................1

N.Y. Exec. Law § 290 ......................................................................1

N.Y.C. Admin. Code § 8-101 ................................................................2

Regulations

29 C.F.R. § 825.220 .......................................................................23

Other Authorities

Asian Women and Employment Discrimination: Using Intersectionality Theory to
   Address Title VII Claims Based on Combined Factors of Race, Gender and
   National Origin,
   37 B.C. L. Rev. 771 ................................................................ 44, 45

**PRELIMINARY STATEMENT**

Plaintiff-Appellant Lia Tieu ("Tieu") began working at the New York City Economic Development Corporation ("EDC") in July 2018 as a Vice President of Asset Management. In early 2019, Tieu announced her pregnancy and in May 2019, requested protected leave. Her supervisor, Winthrop Hoyt ("Hoyt"), made angry comments accusing Tieu of "shirking" her responsibilities, not taking "ownership" of her work, and demanding that Tieu be "grateful" because her colleague was "doing [Tieu] a favor" by filling in while Tieu was away. Tieu gave birth in August 2019 and thereafter, while on maternity leave and, after her maternity leave ended, went on medical leave to recover from a tumor on her pituitary gland, and from postpartum depression and anxiety. Throughout this ordeal, EDC made clear that it did not want to accommodate Tieu for her high-risk pregnancy and disability. Indeed, Hoyt and his boss, Rachel Loeb ("Loeb"), griped in private chat messages that neither "wanted" nor "expected" Tieu to return from leave. Defendants ultimately retaliated against Tieu for her protected activity. Defendants' conduct violated the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(2); the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"); the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq.* ("Section 1981"); the New York State Human Rights Law ("Executive Law"), N.Y. Exec.

1

Law § 290 *et seq.*; and the New York City Human Rights Law ("City Law"),

N.Y.C. Admin. Code § 8-101 *et seq.*

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this action pursuant to

28 U.S.C. §§ 1331 and 1343 because Tieu brought colorable claims arising under

federal law. Specifically, Tieu alleged violations of the FMLA, Title VII, the

ADA, and Section 1981. She also asserted pendent state claims under the

Executive Law and the City Law.

On February 13, 2024, the district court (Torres, J.) granted Defendants'

motion to dismiss Tieu's federal claims and declined to exercise jurisdiction over

her local law claims. Tieu v. New York City Economic Dev. Corp., --- F. Supp. 3d

---, 2024 WL 580063 (S.D.N.Y. 2024). On March 13, 2024, Tieu filed a timely

Notice of Appeal. A-2934.

## ISSUES PRESENTED

(1)      Whether the district court erred in dismissing Tieu's FMLA claims.

(2)      Whether the district court erred in dismissing Tieu's Title VII

pregnancy discrimination claims.

(3)      Whether the district court erred in dismissing Tieu's Title VII and

Section 1981 race and sex discrimination claims.

(4)      Whether the district court erred in dismissing Tieu's retaliation claims.

2

## STATEMENT OF THE CASE

### I. BACKGROUND

Tieu began working for EDC in July 2018 as a Vice President of Asset Management, initially reporting to Darryl Connelly.  A-2683; A-995.[1]  In October 2018, Tieu began reporting to Hoyt, but Tieu worked very closely with and was supervised by Lauren Wolf, a Senior Vice President in the RETS group.  A-2684; A-973; A-502; A-2805; A-2810.  Hoyt admitted that Tieu worked more closely with Wolf, and that Hoyt worked progressively less closely with Tieu over time.  A-2684; A-513-514.  Hoyt did not interact with Tieu daily, nor did he work closely with Tieu because, generally, Hoyt did not manage or supervise Tieu, nor was he directly involved in Tieu's projects.   A-2684; A-1154; A-2805.  Wolf had very positive things to say about Tieu's performance and said she was doing a very good job.   A-2684; A-516-517.

### II. TIEU'S LEAVE AND ACCOMMODATION REQUESTS

In or around January 2019, Tieu notified Hoyt that she was pregnant.   A-2684; A-517.  Shortly thereafter, Tieu requested to work from home two days per week for two weeks to manage the complications and symptoms of her high-risk pregnancy, but the request was denied by Rebecca Osborne, who claimed that EDC did not have a formal work from home policy even though Tieu was aware of

---

[1] "A_" refers to pages of the Appendix.

3

at least one other employee who was permitted to work from home. A-2684; A-1012, A-1014, A-1019-A-1020; A-2810. After Osborne denied the accommodation, Tieu requested a flexible work arrangement to work from the office from 10 a.m. to 3 p.m. for the period of January 31, 2019, through March 1, 2019, which was granted. A-2685; A-1026.

In or around February 26, 2019, Tieu suffered a sudden sensorineural hearing loss in her left ear while approximately 12 weeks pregnant, and as a result, her doctors advised her to work from home for two weeks, where she could perform the essential functions of her job. A-2685; A-2810. Tieu provided Osborne with a note from her doctor, A-2685; A-1035, and explained that her doctor recommended two weeks of remote work. A-2685; A-1038. Osborne labeled Tieu "unfit for work" and sent her home. A-2685; A-1038. Loeb, who admitted that Osborne's response was callous, A-2685; A-2806, attempted to brush off Osborne's comment, claiming it was an outdated Australian term. A-2686.

In early May 2019, Tieu met with Khary Hair (EDC HR employee) to request parental leave. A-2686; A-1590-1591. EDC's procedures required that Tieu's manager, Hoyt, sign a leave form. A-2686; A-1601-1602. Hoyt refused, stating, "I'm not signing this form," A-2686; A-1053, and claimed (falsely) that

4

Tieu was "not eligible" and that her form "was wrong." A-2686; A-1053. Ultimately, Hoyt was forced to sign the form. A-2686; A-1596-1597.

Hoyt also forced Tieu to perform tasks that could be detrimental to her health. For example, Hoyt demanded that Tieu serve as deposition witness in July 2019. A-2687; A-1083. As the deposition approached, Tieu's baby was diagnosed with IUGR, making her pregnancy even higher risk. A-2687; A-1080. Nearing her due date, Tieu notified EDC that her water could break at any moment, and that she may not be available for the deposition. A-2687; A-1076. Jill Braverman (EDC Assistant General Counsel) advised Hoyt that he needed to make himself available for the deposition. A-2687; A-1833-1838. Hoyt became angry and berated Tieu, accusing her of "shirking" her responsibilities and telling her that she needed to take "ownership" of her work, A-2687; A-1078, A-1084, A-1107 ; A-2811, and demanded that Tieu appear for the deposition. A-2687; A-1078. Ultimately, because of Hoyt's refusal, the deposition had to be moved so that Tieu could attend. A-2687; A-1083.

Tieu understood that a colleague, Sabrina Lippman, would be working on her projects while Tieu went on maternity leave, and thus, Tieu assisted in the transition. A-2688; A-1063. Hoyt, however, falsely accused Tieu of "bossing" Lippman around and claimed that Tieu should be "grateful" that Lippman was doing Tieu's work and that she was doing Tieu a "favor." A-2688; A-1086.

On July 24, 2019, Tieu protested to Hoyt that she had the right to take maternity leave without feeling guilty, and that no one was doing her a favor while she is on maternity leave. A-2688; A-1084-1087. On July 25, 2019, the next day, Hoyt gave Tieu a negative performance review. A-2688; A-1084-1087. Tieu expected a higher rating because she had been a strong performer and no one previously mentioned any deficiencies in her performance. A-2688; A-1187. A higher rating would result in a higher increase in pay. A-2688; A-1187. Hoyt told Tieu that he debated whether he was going to criticize her because she was nine months pregnant and about to go on leave. A-2689; A-1096. However, Hoyt ultimately decided that Tieu "needed to hear it" and that it could have been worse. A-2689; A-1095. To further punish Tieu, Hoyt told her that he planned to "keep a list of all [her] wrongdoings." A-2689; A-1087.

## III.   TIEU'S CONTINUED PROTECTED COMPLAINTS OF DISCRIMINATION

Tieu reported Hoyt's July 2019 performance review to James Patchett (then President of EDC), explaining that Hoyt was creating a hostile work environment, that she felt he was discriminating and retaliating against her because he was resentful of her impending maternity leave and that he gave her an unfair and inappropriate annual review that she felt was retaliatory. A-2689; A-1104. Tieu felt that Hoyt was resentful that he had to do more work. A-2689; A-1086.

6

Patchett told Tieu that he could transfer her to another department when she came back from leave, but neither he nor anyone in HR advised Tieu that she needed to apply for an open position. A-2689; A-1176; A-2812. Tieu also complained to Julie Gresack, Wolf, Steve Lazarus, Richard Palumbo, Rosa Vasquez and Loeb. A-2689; A-1097.

Tieu later reported Hoyt's discriminatory animus about her maternity leave to Hair, A-2689; A-2599-2600, and to Loeb in July 2019. A-2690; A-1097. Rather than investigate Tieu's complaints, Loeb summarily dismissed them and interrogated Tieu about whether she knew when Hoyt wrote the review. A-2690; A-2811. Loeb also attacked Tieu for her disability and asked whether Tieu had heard Hoyt correctly because she had lost hearing earlier in her pregnancy. A-2690; A-2811.

On July 31, 2019, Tieu met with Patchett to report Loeb's hostility. Tieu told Patchett that she planned to file a formal complaint, A-2690; A-2811, which she did on August 1, 2019, with Rosa Vasquez and Erica Edwards-O'Neal (EDC's former Equal Employment Opportunity Officer and SVP of Diversity, Equity and Inclusion). A-2690; A-2811. Vasquez questioned whether Tieu was overreacting to Hoyt's criticism, saying "a three [that she received from Hoyt] is good" and that there was "a difference between poor management and discrimination." A-2690; A-2811. Tieu responded by showing Vasquez various emails and documents

7

substantiating her complaint. A-2690; A-2811. Vasquez claimed that EDC would conduct a thorough investigation, provide Tieu with a detailed report containing witness interviews and would contact Tieu (while she was on maternity leave) if she had any questions. A-2690; A-2811.

On August 2, 2019, Tieu responded in writing to the negative performance review and once again protested Hoyt's discrimination, stating that Hoyt had exhibited "discriminatory animus" toward her over the past four months because of her impending pregnancy leave. A-2691; A-2811-2812; A-2586-2588.

## IV. TIEU'S REQUEST FOR DISABILITY LEAVE

In August 2019, Tieu gave birth by cesarean section, and in or around October 2019, was diagnosed with a pituitary tumor, which required surgery, and led her to experience postpartum depression and anxiety. A-2692; A-2594-2601; A-2812. As such, Tieu was unable to return to work in late December and she requested an extension of her leave. A-2692; A-1146.

On November 4, 2019, Tieu wrote to Patchett and Hair asking for assistance coordinating her medical leave. A-2692; A-2599-2600. Tieu explained, "I was recently diagnosed with a pituitary tumor that [was] impinging on my optic nerve and that requires surgery in order to preserve my vision [and that] [t]his latest development complicates my existing postpartum depression and recovery." A-2692; A-2599-2600. Tieu further attached a note from her treating psychotherapist,

8

explaining her health conditions as well as her psychotherapist's recommendation that Tieu take "an extended leave of 24 weeks [until June 2020] from the pressure of work for post-operative healing and recovery." A-2692; A-2599-2601.

On November 23, 2019, Tieu submitted her disability leave forms to Aetna, the outside insurance company responsible for managing disability leave at EDC. A-2693; A-2812. On December 12, 2019, Tieu's therapist submitted forms substantiating her need for medical and disability leave. A-2693; A-2812. On December 4, 2019, Tieu underwent brain surgery and was discharged from the hospital on December 6, 2019. A-2693; A-2812.

On December 17, 2019, Tieu had still not heard any confirmation from EDC regarding her disability leave, and with her original return to work date of December 23, 2019, approaching, Tieu emailed Hair to ask about the status of her disability leave request. A-2693; A-2595-2596. Once again, EDC attempted to block Tieu from exercising her rights when Hair stated that Tieu could not change her return-to-work date "until [she] receive[d] formal word from Aetna as to [her] status." A-2693; A-2595. Hair then suggested that her job was at risk, saying, "[a]ccording to the [FMLA] your job protection ended on [October 25, 2019]. Your company provided Parental Leave is ending as of [December 20, 2019]. In order for us to continue holding your position on our books we must have some documentation to support the action." A-2693; A-2595. Tieu responded to Hair on

9

December 18, 2019, copying Patchett, explaining that she had already submitted the documentation required for an "ADA accommodation." A-2694; A-2594-2595.

Fearful of losing her job, Tieu also explained that she would return to work on her scheduled return date of December 23, 2019, "against [her] medical provider's orders and despite [her] ongoing physical, mental and emotional recovery from [her] recent brain surgery and postpartum depression and anxiety." A-2694; A-2594-2595.

The next day, December 19, 2019, Tieu sent Hair a letter from her physician recommending an extension of her leave to March 4, 2020, at which point her physician would conduct a follow up evaluation to determine whether Tieu could safely return to work. Tieu wrote in the cover email to Hair and Patchett that she "hope[d] that this letter, along with the Nov. 4, 2019 letter from [her] therapist (who recommends an extension of [her] leave to June 15, 2020), underscores and helps EDC understand the gravity of [her] medical condition and the necessity of extending [her] leave." Tieu explained that "[g]iven that [her] medical care professionals both recommend[ed] extending [her] leave but differ[ed] on the return date, a provisional extension of [her] leave to at least March 4, 2020 [was] warranted." A-2694; A-2603-2604.

On December 20, 2019, the Friday before Tieu was scheduled to return to work, Hair finally granted her accommodation request, writing that HR was

10

"accepting [her] letter as a basis to provide [her] with an unpaid leave of absence" through March 4, 2020.  A-2695; A-2606.

## V.   EDC SUMMARILY DISMISSES TIEU'S COMPLAINTS AND CONTINUES HOSTILITY AGAINST HER

As of November 4, 2019, Tieu had still not received an update on the status of her complaint so she sent a follow up email to Patchett.  A-2695; A-2600.  On November 7, 2019, Tieu received the results of EDC's purported investigation.  A-2695; A-2608.  The superficial conclusion was less than half a page and stated that Tieu's claims had been unsubstantiated.  A-2695; A-2608.  Tieu provided Edwards-O'Neal and Vasquez with a list of eight witnesses to interview but they failed to interview them.  A-2695; A-2568; A-1979.

Vasquez and O'Neal prepared a report based on their investigation, but the Report misrepresented what Tieu stated in her interview with them.  Vasquez admitted that select portions of the interview notes, including quotes from Tieu, were either misquoted or omitted.  A-2695; A-815-816.  The Report quotes a question that was never asked of Tieu and then misstates Tieu's answer to make it appear that she was only accusing Hoyt of being lazy, rather than of discrimination based on pregnancy.  A-2696; Id.  EDC withheld from Tieu the final Investigation Report that was sent to Patchett, which falsified Tieu's statements during her interview.  A-2696; id.  EDC's Equal Employment Opportunity Policy and Complaint Procedure does not authorize the creation of two separate reports and

11

does not permit EDC to withhold the final report from the complainant. A-2696; A-2610; A-2612-2618. Rather than taking any corrective action about Hoyt's conduct, EDC promoted Hoyt to the role of Co-Head of Portfolio Management. A-2696; A-432-433.

On November 18, 2019, Tieu emailed investigators and asked multiple questions about the investigation process. Tieu also repeated her request for a new and fair review from another manager who truly knew her work and to be transferred to a new department to be removed from the hostile work environment. A-2696; A-2620-2621. On November 20, 2019, EDC responded stating that it would "have no further comment." A-2696; A-2620.

## VI. TIEU RETURNS TO WORK AND FACES CONTINUED DISCRIMNATION AND RETALIATION

The EDC learned that Tieu would be returning to work in May 2020. A-2696. Hoyt and Loeb, in a private text exchanged, griped that they neither "expected" nor "wanted" Tieu to return. A-2697; A-2579.

Upon her return, EDC subjected Tieu to further acts of discrimination and retaliation. A-2696; A-1151-1152. According to Tieu, "80 percent of my projects were taken away from me," "they called me a new hire, they treated me like a new hire, they made me go to a new hire orientation" and her supervisors, including Hoyt, "were constantly scrutinizing me." A-2702; A-1151.

12

On June 3, 2020, Plaintiff filed a Charge of Discrimination with the EEOC and provided the same to counsel for Defendants. A-2698; A-2623-2646. On February 1, 2021, the next review cycle, Hoyt gave Tieu an even worse (and again false) review. A-2698; A-1157-1158. As a result of the review, Tieu did not receive a bonus. A-2699; A-1162.

On March 3, 2021, Tieu complained that her February 2021 performance review was retaliatory because Hoyt did not manage her, was not familiar with her work, and never provided her contemporaneous feedback. A-2699; A-1154. Tieu also stated that she worked primarily with Wolf, but she (Wolf) was not permitted to complete an evaluation of Tieu. A-2699; A-2648-2652. Tieu also complained that Hoyt criticized Tieu for events outside the review period. A-2699; A-2648-2652. Finally, Tieu complained that she was forced to have two-on-one meetings with Hoyt and Julie Stein. A-2699; A-2648-2652. In June 2021, EDC, once again, advised Tieu that her complaint could not be substantiated. A-2699; A-2654.

In the summer of 2021, Tieu was subjected to a Summer Performance Review even though non-Asian male colleagues who were out on parental leave were not required to write such reviews. A-2699; A-2656-2666; A-2668-2671. Tieu complained about the Summer Performance Review as discriminatory and retaliatory on September 10, 2021. A-2700; A-2688-2671. Tieu alleged that she

13

was subjected to intense scrutiny by Hoyt even though she did not work with him on a regular or frequent basis, and he was not involved in her projects. A-2700; A-2668. Tieu stated that the alleged issues raised in the review were never brought to her attention prior to being penalized for them in her review. A-2700; A-2668. Tieu also protested that Hoyt referred to examples that occurred outside the review period. A-2700; A-2669. Again, EDC claimed it could not substantiate that the Summer Performance Review was retaliatory. A-2700; A-2673-2674.

## VII. RACE AND SEX DISCRIMINATION DEMONSTRABLE BY CONDUCT TOWARDS OTHERS

In September 2018, Tieu complained to HR about being mistreated by Connelly, Tieu's then supervisor. A-2700; A-997. Tieu complained that Connelly was demoralizing, negative, uninvolved and that he badmouthed people, especially Tieu's subordinate, Jinquan Liang. A-2700; A-998. In October 2018, Tieu requested a transfer out of Connelly's group. A-2700; A-1005-1006. Other members on Connelly's team shared similar feelings about Connelly, including Liang and Stacy Yan who ultimately transferred out of Connelly's group. A-2700; A-1007.

Moreover, other Asian women at EDC felt mistreated and harassed by Hoyt. A-2701; A-2812-2813. A Korean woman and a former Senior Associate at EDC was generally regarded as very capable and was trusted with managing her own projects. A-2701; A-2812-2813. As with Tieu, Hoyt was not involved with this

14

employee's day-to-day work and seemed not to know much about her projects.  Id.

Nonetheless, Hoyt would regularly interfere and insist that this employee make

changes to her work that made no sense.  Id.  When this employee resisted, Hoyt

became enraged that she, an Asian woman, would disagree with him, labeling her

"difficult" and "combative," A-2701; A-2813, wrote a negative performance

review and placed her on a performance improvement plan ("PIP").  Id.  Believing

that she was being targeted because of her race and gender, this employee refused

to sign the PIP and ultimately resigned.  Id.

Another Asian employee, a Korean woman who indirectly reported to

Connelly, had similar experiences.  A-2701; A-2813.  She complained to HR about

Connelly's mistreatment.  Id.  In 2019, she was verbally berated by Hoyt when she

remarked on a business matter in the workplace.  Id.  She, too, eventually resigned.

Id.  Yet another Asian employee, a Chinese woman and Assistant Vice President

made similar complaints of mistreatment at EDC.  A-2702; A-2813-2814.  This

employee took the AVP role with the promise of being promoted to Vice President.

Id.  When she was passed up for a promotion, she made a complaint.  Id.  The

following day, EDC posted a job position to replace her.  Id.  This employee then

made a further complaint to the Head of Human Resources at the time, Patti Lukas,

who attempted to intervene on her behalf.  Id.  Ultimately, she was unsuccessful,

and this employee was not given a promotion.  Id.  The employee told Tieu that she

15

believes she was also a victim of discrimination.  Id.  She resigned in June 2019.

Id.

## VIII.  <u>PROCEDURAL HISTORY</u>

On February 13, 2024, the district court (Torres, J.) granted Defendants'

motion for summary judgment on Tieu's federal claims only.  The district court

found, *inter alia*, that Tieu:

(i)     presented sufficient evidence to permit a rational factfinder to infer

pregnancy discrimination in violation of Title VII, but nonetheless dismissed the

pregnancy discrimination claim by crediting Defendants' purportedly legitimate

non-discriminatory reasons for the adverse actions;

(ii)    failed to present a prima facie case of race and sex discrimination

under Title VII and Section 1981, despite proof that numerous Asian women,

including Tieu, were labeled "aggressive," "difficult" and "combative" merely

because they were assertive;

(iii)    failed to present sufficient proof of interference with Tieu's FMLA

rights (a) despite proof that Tieu's supervisor tried to dissuade her from taking

protected leave by initially refused to sign her FMLA forms and then berating her

for "shirking" her responsibilities, telling her that she "should be grateful" that a

colleague would cover for her during her maternity leave and (b) because Tieu took

16

more than 12 weeks of protected leave, an argument that was never raised by the Defendants nor briefed by the parties; and

(iv)    presented sufficient evidence to permit a rational factfinder to infer retaliation in violation of the FMLA, Title VII, the ADA and Section 1981, but nonetheless dismissed the retaliation claims by crediting Defendants' purportedly legitimate non-discriminatory reasons for the adverse actions.

The district court declined to exercise supplemental jurisdiction over Tieu's discrimination and retaliation claims under the local New York statutes.

## SUMMARY OF ARGUMENT

The district court's dismissal of Tieu's lawsuit was in error.  First, Tieu produced sufficient evidence from which a reasonable jury could conclude that Defendants interfered with her FMLA rights by taking actions to discourage her use of protected leave and refusing to restore her to the same position upon her return from leave.  Tieu presented proof, *inter alia*, that her supervisor Hoyt initially refused to grant her full leave, made numerous angry comments indicating that Defendants were doing her a favor by permitting her to take leave, and then lamented her return from leave.  The district court, however, refused to consider this evidence in its totality, as this Court requires in evaluating employment claims at the summary judgment stage, instead viewing each hostile comment in isolation and interpreting each in the light most favorable to Defendants, not Tieu.

17

Moreover, the district court never reached Tieu's claim that Defendants interfered with her restoration rights by, for instance, removing 80% of her responsibilities, because, according to the district court, Tieu was unable to return at the end of her FMLA leave. But Defendants never raised this argument as a basis for summary judgment and therefore waived the argument.

Next, the district court erred in dismissing Tieu's FMLA retaliation claim. Tieu presented significant proof that Defendants retaliated against her for seeking protected leave and for protesting the denial of her FMLA rights, including that Defendants retaliated against her virtually each time she engaged in protected activity, made hostile comments about her taking protected leave, falsely criticized her performance after she exercised her rights and conducted an investigation that was not only flawed, but engineered to clear Defendants of any wrongdoing. The district court, however, applied the wrong legal standard in evaluating Tieu's FMLA retaliation claim, requiring her to show that retaliation was the "but-for" cause of the adverse acts when, in fact, Tieu was only required to show that her FMLA-related protected activity was a "motivating factor."

Moreover, and once again, the district court improperly considered Tieu's evidence of retaliation in isolation. For instance, the district court considered Tieu's powerful proof of temporal proximity only at the prima facie stage, and then disregarded it entirely when considering whether there was a sufficient causal

18

nexus between Tieu's protected activity and the adverse acts. And, as with Tieu's interference claim, the district court improperly construed the overall proof of retaliation, including Hoyt's incriminating comments, in the light most favorable to Defendants.

The district court similarly erred when it dismissed Tieu's pregnancy discrimination claim for largely these same reasons. Inexplicably, the district court found that "a rational factfinder could interpret [Tieu's supervisor's] comments as suggesting that Tieu, a soon-to-be mother, was not showing the same level of commitment she had previously shown because of her pregnancy," but nixed the claim anyway.

The district court also mistakenly dismissed Tieu's combined race and sex discrimination claim. Tieu presented evidence that she, and other female Asian employees, were labeled "aggressive," "difficult" and "combative," among other things, because they did not conform to the ageist and racist stereotype that Asian women are docile. Indeed, the district court confirmed that "describing a woman as 'aggressive' invokes invidious gender stereotypes," yet rejected the claim by mislabeling the ugly comments as mere "stray remarks" and rejecting, out of hand, evidence of Defendants' mistreatment of other Asian female employees.

Finally, the district court improperly dismissed Tieu's Title VII, ADA and Section 1981 retaliation claims by, once again, ignoring the totality of evidence

19

Tieu produced. Moreover, the district found that stripping Tieu of any direct reports, subjecting her to heightened supervision and requiring her to attend training (as if she were a new employee) upon her return were not actionable adverse acts. However, recent Supreme Court authority makes clear that an employment plaintiff need not prove that she suffered "significant," "serious," or "substantial" harm to prove her employment claims. She need only show, as Tieu certainly did, some harm related to the terms and conditions of her employment.

## ARGUMENT

## I.  THE SUMMARY JUDGMENT STANDARD

This Court reviews *de novo* a district court's grant of summary judgment. <u>Bart v. Golub Corp.</u>, 96 F.4th 566, 569 (2d Cir. 2024). This Cout "may affirm only if the record reveals no genuine issues of fact for trial. Summary judgment is improper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Banks v. Gen. Motors, LLC</u>, 81 F.4th 242, 258 (2d Cir. 2023). Put differently, "[s]ummary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit." <u>Redd v. N.Y. Div. of Parole</u>, 678 F.3d 166, 174 (2d Cir. 2012) (citation omitted).

In deciding the motion, "the district court is required to resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." <u>Green v. Town of East Haven</u>, 952 F.3d 394, 406 (2d Cir. 2020) (quoting <u>Kessler v. Westchester Cnty. Dep't of</u>

Soc. Servs., 461 F.3d 199, 206 (2d Cir. 2006)).   Moreover, "the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record." Rasmy v. Marriott Int'l., Inc., 952 F.3d 379, 386 (2d Cir. 2020) (quoting Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (emphasis omitted) (citation and internal quotation marks omitted)); see Friedman v. Swiss Re America Holding Corp., 643 F. App'x 69, 72  (2d Cir. 2016) (reversing grant of summary judgment in age discrimination case where "the district court failed to consider 'the record as a whole'") (quoting Byrnie v. Town of Cromwell, Bd. Of Educ., 243 F.3d 93, 102 (2d Cir. 2001)).

Importantly, this Court has "long recognized 'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'" Walsh v. New York City Housing Auth., 828 F.3d 70, 784 (2d Cir. 2016) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010)). Indeed, "'where subjective issues regarding a litigant's state of mind . . . are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable.'" Rodriguez v. Vill. Green Realty, Inc., 788 F.3d 31, 49 (2d Cir. 2015) (quoting Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir. 1984)); see id. ("'[A] sojourn into an adherent's mind-set will inevitably trigger myriad factual inferences, as to which reasonable persons

21

might differ in their resolution.  Traditionally, this function has been entrusted to the jury.'") (quoting <u>Patrick</u>, 745 F.2d at 159)).

Finally, a court may not give credence to the moving party's evidence unless it comes from disinterested witnesses and is neither contradicted nor impeached. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151 (2000); <u>see</u> <u>In re Dana Corp.</u>, 574 F.3d 129, 152-53 (2d Cir. 2009) (reversible error to rely on testimony of interested witness for summary judgment).

In short, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  <u>Carter v. Syracuse City School Dist.</u>, 850 Fed. App'x 22, 26 (2d Cir. 2021) (quoting <u>Rule v. Brine, Inc.</u>, 85 F.3d 1002, 1011 (2d Cir. 1996)); <u>see</u> <u>Danzer v. Norden Systems, Inc.</u>, 151 F.3d 50, 57 (2d Cir. 1998) ("Since the defendant will rarely admit to having said or done what is alleged, and since third-party witnesses are by no means always available, the issue frequently becomes one of assessing the credibility of the parties.").

## II.   <u>FMLA</u>

Congress enacted the FMLA "'to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity; [and] …to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of

a child, and for the care of a child, spouse, or parent who has a serious health condition." Woods v. START Treatment & Recovery Centers, Inc., 864 F.3d 158, 169 (2d Cir. 2017). The FMLA requires employers to (1) provide an eligible employee "leave" for the birth of a child, or to attend to the health of the employee or her child, 29 U.S.C. § 612(1)(A) and (C); and (2) "restore" the employee to the same or "an equivalent position" upon her return from leave. 29 U. S.C. § 2614(a)(l)(B). The statute expressly prohibits an employer from interfering with or retaliating against an employee for exercising or attempting to exercise these rights. Woods, 864 F.3d at 166.

### A. Interference

An employer violates the FMLA's interference clause where it has "denied or otherwise interfered with a benefit to which [an eligible employee] was entitled under the FMLA." Graziadio v. Culinary Inst. Of Am., 817 F.3d 415, 424 (2d Cir. 2016). "Denial of FMLA benefits is interpreted flexibly; '[i]nterfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'" Hill v. City of New York, 136 F. Supp. 3d 304, 342 (E.D.N.Y. 2015) (quoting 29 C.F.R. § 825.220(b)). Thus, an employer violates the interference clause where its "acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." Santiago v.

23

Dep't of Transp., 50 F. Supp. 3d 136, 144 (D. Conn. 2014) (internal citations omitted). In short, the plaintiff need only show "that an 'employer in some manner impeded the employee's exercise of his or her rights' protected by the FMLA." Saraf v. West Publishing Corp., No. 16-CV-1425 (VSB), 2018 WL 7107266, at *16 (S.D.N.Y. Dec. 20, 2018) (quoting Di Giovanna v. Beth Israel Med. Ctr., 651 F. Supp. 2d 193, 199 (S.D.N.Y. 2009)).

Here, the record contained sufficient evidence for a jury to conclude that Defendants acted to discourage Tieu from exercising her FMLA rights. Hoyt summarily denied Tieu pregnancy leave, telling her that he was "not signing" her FMLA form because, according to Hoyt, Tieu was "not eligible." A-2686; A-1053. (In fact, Tieu was eligible for full protected leave.) Thereafter, Hoyt repeatedly made disparaging remarks about Tieu's leave, telling Tieu that she was "shirking" her responsibilities, "needed to take ownership of [her] work," "should be grateful" that a colleague would be "doing [Tieu's] work" while she was "on maternity leave" and the colleague was doing Tieu a "favor." A-2687-2688; A-1078, A-1086, A-1107. In making some of these statements, Hoyt lashed out at and "berated" Tieu , A-2687; A-1078, threatened to "keep a list of all [her] wrongdoings," A-2689; A-1087, and gave Tieu a diminished performance review. A-2688; A-1084-1085. A jury could certainly find that Hoyt engaged in acts of "discouragement" that could have "dissuaded" a reasonable employee from

exercising her FMLA rights.  Santiago, 50 F. Supp. 3d at 144.

The district court, however, refused to consider this not insubstantial evidence of obstruction in its totality.  Instead, the district court improperly viewed each act in isolation to determine whether it could dissuade a reasonable person from asserting her FMLA rights.  For instance, the district court found that Hoyt's refusal to "immediately sign the leave form" amounted to a mere "administrative delay," Tieu, 2024 WL 580063, at *11; his berating Tieu was simply a critique of her job performance, Id.; and his comment that Tieu "should be 'grateful' [a colleague] would cover for her during her maternity" was, for unspecified reasons, not enough to show a violation.  Id. at *12.

But the district court's analysis ignores this Court's mandate that on summary judgment in an employment case, the district court must view the record in its totality and not, as the district court did here, in "piecemeal fashion."  Rasmy, 952 F.3d at 386; see Walsh, 828 F.3d at 76 ("[n]o one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact" to find for the employment plaintiff).  As this Court has often recognized, employers rarely, if ever, leave direct proof of their unlawful conduct, see Banks, 81 F.4th at 258 ("clever men may easily conceal their motivations") (quoting Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015)), and, therefore, an employee

must often build her case from disparate pieces of information. <u>Walsh</u>, 828 F.3d at 76.

The district court's fragmented methodology also ignores how people in the real world experience their work environment. As this Court recognized in the analogous context of constructive discharge,[2] "a reasonable person encounters life's circumstances cumulatively and not individually." <u>Chertkova</u>, 92 F.3d at 90. Accordingly, a court must consider the "cumulative" effect of the employer's actions. <u>Id.</u>; <u>see</u> <u>Interdonato v. Bae Sys., Inc.</u>, 16 Fed. App'x 25, 28 (2d Cir. 2001) (court must consider "the totality of [the employer's] actions and inactions"). Courts have thus found that an employer may have acted to discourage an employee from remaining employed "via a combination of a reduction in workload, a change in responsibilities, the absence of advancement opportunities, and being subjected to embarrassing or humiliating treatment." <u>Ibrahim v. Fid. Brokerage Servs., LLC</u>, No. 19-CV-3821 (VEC), 2020 WL 107104, at *8 (S.D.N.Y. Jan. 9, 2020) (citing <u>Halbrook v. Reichhold Chemicals, Inc.</u>, 735 F. Supp. 121, 126 (S.D.N.Y. 1990)). Determining whether an employer acted to discourage an employee's exercise of FMLA rights is no different.

---

[2] "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." <u>Chertkova v. Connecticut Gen. Life. Ins. Co.</u>, 92 F.3d 81, 89 (2d Cir. 1996).

Here, it may be true, as the district court found, that an employee of ordinary resolve may not feel dissuaded from asserting her FMLA rights merely because her supervisor delayed approving her leave for one week. Tieu, 2024 WL 580063, at *11. But that same employee may begin to become concerned when the reason for the delay is not "administrative" but, rather, as happened here, her supervisor falsely tells her that he is "not signing" her leave forms because she is not "eligible" for leave. A-2686; A-1053. And that same employee would most certainly feel pressure not to exercise her leave rights when her supervisor suddenly becomes hostile, A-2687; A-1078, criticizes her performance, A-2689; A-1087; A-2688; A-1084-1086, and makes disparaging comments, including that the employee should be "grateful" that her colleagues are doing her a "favor" by filling in for her when she is out on protected leave. A-2687-2688; A-1078, A-1086, A-1107. Only a jury can determine whether the cumulative impact of these facts amount to unlawful discouragement.[3]

---

[3] Quoting Hockenjos v. Metro Trans. Auth., No. 14 Civ. 1679, 2015 WL 2903269, at *9 (S.D.N.Y. May 18, 2016), the district court reasoned that "[c]riticizing, even berating an employee's substantive job performance is not enough to assert a claim for interference under a discouragement theory." But that only partially describes the court's ruling in Hockenjos. The court also stated, "[c]ritically, plaintiff does not allege that [his managers] made any reference to his FMLA leave whatsoever." Id. Indeed the court cited two cases, Di Giovanna , 651 F. Supp. 2d at 200, and Reilly v. Revlon, 620 F. Supp. 2d 524, 535 (S.D.N.Y. 2009), where courts granted summary judgment because the plaintiffs could not muster any evidence that their employers made any reference to protected leave. Here, of course, Tieu has presented such evidence.

27

The district court also erred when it accepted Defendants' self-serving "innocent explanations" for the disparaging comments, Rasmy, 952 F.3d at 386, and, where there was no plausible non-incriminating explanation, simply disregarded the comment. For instance, the district court held that "Hoyt's criticisms were directed toward Tieu's job performance and communications with [her colleague] Lippman, not toward her impending leave." Tieu, 2024 WL 580063, at *12. But that is an overly generous, and critically incomplete, description of Hoyt's comments. After Tieu requested leave, which Hoyt initially denied, A-2686; A-1053, Hoyt confronted Tieu with the stereotypical trope that she was not working hard enough (accusing Tieu of "shirking" her responsibilities and not taking "ownership of [work]"), which he ultimately tied to her leave (stating that Tieu "should be grateful" that Lippman would be "doing [Tieu's] work while she was on "maternity leave"). A-2687-2688; A-1078, A-1086, A-1107. A reasonable juror could certainly reject the notion that these comments were simply about a "performance deficiency," as the district court found, Tieu, 2024 WL 580063, at *12, and conclude that Hoyt was sending Tieu an ominous message about her leave. Such an interpretation is particularly compelling given that neither Defendants nor the district court could posit any innocent explanation for Hoyt's "grateful" comment. The district court could only summarily shrug off the comment as insufficient to establish interference. Tieu, 2024 WL 580063, at * 12

28

("And although Tieu also alleged that Hoyt told her she should be 'grateful' Lippman would cover for her during her maternity leave, the Court cannot find that this statement would 'dissuade a similarly situated employee of ordinary resolve' from taking leave.").[4]

Finally, the district court did not reach Tieu's allegation that Defendants violated the FMLA by interfering with her restoration rights "because Tieu was undisputedly unable to return to her position after the end of her twelve-week FMLA leave." Tieu, 2024 WL 580063, at *12. But Defendants "never raised" this argument in support of their motion for summary judgment and therefore the "argument[] [is] waived." Triodetic, Inc. v. Statue of Liberty IV, 582 Fed. App'x 39, 40 (2d Cir. 2014); see Aiello v. Stamford Hosp., 487 Fed. App'x 677, 678 (2d Cir. 2012) ("The premise of our adversarial system is that courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.") (internal citations omitted); NML Capital, Ltd. v. Republic of Argentina, No. 05 Civ. 2434 (TPG),

---

[4] The district court cited Golden v. New York City Dept. of Environmental Protection, No. 06-CIV 1587(DLC), 2007 WL 4258241, at *2-3 (S.D.N.Y. 2007), as support for its decision to disregard the "grateful" comment. But the supervisor in Golden did not make negative comments about the employee's leave. Rather, he mocked the employee's "medical conditions," which the court found "unprofessional and hurtful," but not necessarily a violation of the FMLA's leave provision. Id. at *3. Here, Hoyt made direct disparaging comments about Tieu's protected leave. See Kurtanideze v. Mizuho Bank, No. 23 Civ. 8716 (PAE), 2024 WL 1117180, at *16 (S.D.N.Y. Mar. 23, 2024) (managers accusation that employee was "'abandoning his team' to attend to his sons emergency," can be "fairly cast as 'direct' evidence of discriminatory animus").

29

2009 WL 1528535, at *1 (S.D.N.Y. May 29, 2009) (plaintiffs entitled to summary judgment where defendant waived the argument by failing to raise it in its opposition).[5]

## B.    **Retaliation**

The FMLA has two separate anti-retaliation provisions.  First, the FMLA makes it unlawful for an employer to take an adverse action against an employee who seeks to exercise her FMLA rights.  Graziadio, 817 F.3d at 429.  Second, the statute prohibits retaliation against an employee "for opposing" FMLA violations.  29 U.S.C. § 2615(a)(2).  "For purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising h[er] legal rights."  Millea v. Metro-N. R. Co., 658 F.3d 154, 164 (2d Cir. 2011).  FMLA retaliation claims are analyzed under the familiar McDonnell Douglas burden-shifting framework.  Graziadio, 817 F.3d at 429.[6]  To prevail, an employee need only prove

---

[5] Defendants' failure to raise this issue is not surprising.  In December 2019, Hair, from EDC's Human Resources department, "advised Tieu that her FMLA job protection had ended on October 25 and her EDC-provided leave would end on December 20, and asked her to provide 'some documentation' to 'continue holding [her] position on our books.'" Tieu, 2024 WL 5800063, at *4.  Tieu responded by telling Hair that she "will return to work on Monday, Dec. 23, 2019 against my medical providers' orders." A-2594.  Ultimately, Tieu did not have to return because EDC extended her protected leave.

[6] In Graziadio, this Court described the burden-shifting test as follows:

> To establish a prima faci[e] case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse

that her exercise of FMLA rights or her protest of FMLA violations was a "motivating factor" in the adverse employment action. Woods, 864 F.3d at 166. That is, an employee prevails where she establishes "that the prohibited factor [in this case, retaliation] was at least one of the 'motivating' factors." Holtz v. Rockefeller & Co., 258 F.3d 62, 78 (2d Cir. 2001).

This Court has recently clarified the "motivating factor" test in employment cases. In Bart, this Court held that "while a plaintiff may satisfy the third-stage burden under McDonnell Douglas by showing that the employer's stated reason was false and just a pretext, or cover, for a [retaliatory] intent, a plaintiff is not required to demonstrate the falsity of the employer's proffered reason." 96 F.4th at 570 (emphasis in original) (citing Henry v. Wyeth Pharms., Inc., 616 F.3d 134, 156 (2d Cir. 2010)). Instead, the "plaintiff can prevail by proving that an impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation." Id. (emphasis added) (quoting Fields v. N.Y. State Off. of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 120 (2d Cir. 1997)). In other words, "[a] plaintiff may

---

employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that the defendant's proffered explanation is pretextual.

817 F.3d at 429 (internal citations omitted).

31

rely on other evidence that an impermissible criterion was a motivating factor in the employer's decision to take the adverse action." Id.  In short, the "plaintiff need not prove that the employer's stated reason was <u>false</u>," she "need only show that the employer's stated reason – even if true or factually accurate – was not the 'real reason,' in the sense that it was not the <u>entire</u> reason due to a coexisting impermissible consideration."  Id. at 575 (emphasis in original).

Here, the district court appears to have applied the wrong standard in evaluating Tieu's FMLA retaliation claim.  While the district court initially recited the proper "motivating factor" standard in its general discussion of the law, <u>Tieu</u>, 2024 WL 580063, at *12, it nevertheless required "Tieu to establish 'that the desire to retaliate was the but-for cause of the challenged employment action'" even for Tieu's FMLA retaliation claim.  Id. at *13 (quoting <u>Horning v. Trustees of Columbia Univ. in City of New York</u>, No. 17 Civ. 3602 (ER), 2022 WL 976267, at *23 (S.D.N.Y. Mar. 31, 2022)).

Moreover, as it did with respect to Tieu's interference claim, the district court, once again, improperly evaluated each strand of evidence of retaliation in isolation.  See <u>Tieu</u>, 2024 WL 580063, at *13 ("temporal proximity between a protected [activity] and an adverse employment action is insufficient to satisfy plaintiff's burden to bring forward some evidence of pretext") (quoting <u>Ya-Chen Chen v. City Univ. of New York</u>, 805 F.3d 59, 72 (2d Cir. 2015)); <u>id.</u> at *14 ("The

32

Court has already discussed why Hoyt's alleged comment about Tieu 'shirking' her work does not suffice to show pretext."); id. ("The fact that Wolf did not deliver Tieu's performance reviews does not establish that Defendant's reasons for their scores were pretextual."); id. ("a faulty investigation is not in and of itself evidence of pretext"). And where it could not simply disregard Tieu's proof of retaliation, the district court improperly construed the evidence in Defendants' favor.

Applying the proper test (motivating factor) and construing the evidence in its totality and in the light most favorable to Tieu as the non-moving party, there was more than sufficient evidence for a jury to find "a causal connection [exists] between [Tieu's] protected activity and the adverse action taken by [her] employer." Donnelly v. Greenburgh Cent. Sch. Dist., No. 7, 691 F.3d 134, 152 (2d Cir. 2012) (quoting Mack v. Otis Elevator Co., 326 F.3d 116, 119 (2d Cir. 2003).

### 1. Timing

Temporal proximity is a significant indicator of retaliation. A jury can infer retaliation where the adverse actions follow the protected activity. Saraf, 2018 WL 7107266, at *15. Retaliation can also be shown where the "pattern of [unlawful] conduct begins soon after" the protected activity and "only culminates later" in adverse action. Laudadio v. Johanns, 677 F. Supp. 2d 590, 614 (E.D.N.Y. 2010) (quoting Billue v. Praxair, Inc., No.CIV.A 305CV00170CH, 2007 WL 1231841, at

*8 (D. Conn. Apr. 26, 2007), aff'd, No. 07-2359-CV, 2008 WL 4950991 (2d Cir. 2008)).

Tieu engaged in two types of FMLA-related protected activity. First, she sought FMLA leave. Second, she protested that Hoyt was violating her FMLA rights. A jury could easily find from the tight timeline of events that Tieu suffered an increasing backlash as she engaged in protected activity by advocating for her FMLA rights. On May 7, 2019, Tieu asked Hoyt to sign her FMLA form. A-2686; A-1053; A-1727. Hoyt immediately lashed out, telling Tieu (falsely) that she was "not eligible" and that he was "not signing" her form. A-2686; A-1053. Shortly, thereafter, in July 2019, Hoyt began accusing Tieu of "shirking" her responsibilities and demanding that she "take ownership" of her work. A-2687; A-1107; A-2811. On July 24, 2019, Hoyt continued to lash out, accusing Tieu (again, falsely) of "bossing around" her colleague and stating that Tieu "should be grateful" because her colleague was doing Tieu a favor by doing Tieu's work while she was on maternity leave. Id. The next day, July 25, 2019, Hoyt gave Tieu a negative performance review, criticizing her communications skills, A-2688; A-1084-1086, something that he had never done before. A-2688; A-1085. Tieu again protested. A-2689; A-1087; A-2811. Hoyt then threatened that he planned to "keep a list of all [her] wrongdoings." Id.

34

The retaliatory conduct continued after Tieu went on leave and when she returned.  On February 20, 2020, while on medical leave, Tieu hired counsel and sent a demand letter, protesting, among other things, that Defendants violated Tieu's leave rights.  A-2676-2680.  When Tieu ultimately returned to work on May 4, 2020,  A-2697, A-2698, A-2702; A-1094, A-1150-1151; A-2652, Defendants treated her as new employee id., removed her supervisory responsibilities id., stripped her of 80% of her responsibilities id. and left her with only short-term assignments.  Id.  On June 3, 2020, Tieu filed an administrative complaint with the EEOC.  A-2623-2646.[7]  During the next annual review cycle, Hoyt gave Tieu an even worse review, causing Tieu to lose a bonus given to her peers.  A-2699; A-1162.

Defendants cannot seriously claim that the timeline is too attenuated to permit an inference of retaliation.  In one instance, Defendants retaliated the day after Tieu engaged in protected activity.  See Saraf, 2018 WL 7107266, at *15 (adverse action "several days" after protected activity "is sufficient to establish an inference of retaliatory intent").  At other times, retaliatory action occurred within a month or two.  See Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002) (holding that a "few months" between complaint and adverse action supports

---

[7] The EEOC charge, which alleges sex, pregnancy and race discrimination, states that Defendants "also violated" the FMLA.  A-2623-2646.

inference of causation). And in some instances, Defendants retaliated at the next available "opportunity," <u>Summa v. Hofstra Univ.</u>, 708 F.3d 115, 128 (2d Cir. 2013), such as the next annual review or pay cycle. <u>See</u> <u>Magilton v. Tocco</u>, 379 F. Supp. 2d 495, 504 (S.D.N.Y. 2005) ("While ordinarily the passage of nine months between the protected activity and the alleged retaliation is far too much to permit an inference… this was the first opportunity that [defendant] had to 'punish' plaintiff in his pocketbook"). Moreover, considering these events in their totality, a jury could certainly conclude that Defendants retaliated.

While the district court considered Tieu's proof of temporal proximity at the pretext stage, <u>Tieu</u>, 2024 WL 580063, at *13, it improperly dismissed its significance when analyzing whether a jury could ultimately find retaliation because, in the district court's view, "temporal proximity . . . is insufficient to satisfy plaintiff's burden to bring forward some evidence of pretext." <u>Id.</u> (quoting <u>Ya-Chen Chen</u>, 805 F.3d at 72). But that temporal proximity may not be sufficient, standing alone, does not mean it is irrelevant. Indeed, this Court has long recognized that a plaintiff's proof at the prima facie stage can and, in fact must, be considered in the final analysis. <u>See</u> <u>Bart</u>, 96 F.4th at 576 (recognizing that the "plaintiff's ultimate burden . . . may often be carried by evidence comprising the prima facie case, without more") (<u>quoting</u> <u>Cronin v. Aetna Life Ins. Co</u>, 46 F.3d 196, (2d Cir. 1995)). To that end, it is well settled that other evidence of pretext

36

and close temporal proximity between an employee's" protected activity and the adverse acts "are sufficient to create a triable issue of fact" as to retaliation. Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013). Unfortunately, the district court here failed to follow this analysis.

### 2. Comments

Statements can be "powerful evidence of" unlawful conduct. Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 116 (2d Cir. 2007) abrogated on other grounds by Gross v. FBL Financial Services, Inc., 557 U.S. 167, 167 (2009). "The relevance of [retaliation]-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." Id. at 116. "The more a remark evinces a [retaliatory] state of mind, and the closer the remark's relation to the allegedly [retaliatory] behavior, the more probative the remark will be." Id. at 115. Importantly, a plaintiff "need not show that the [decision-maker] declared that [that adverse action] was tied" to the employee's protected activity. Tolbert v. Smith, 790 F.3d 427 at 438 (2d Cir. 2015). "Statements showing an employer's bias" are sufficient. Id.

As explained above, the record here contains numerous comments from which a jury could find that Hoyt resented Tieu for taking protected leave. He accused her of "shirking" her responsibilities, not taking "ownership" of her work,

37

claimed that she "should be grateful" that a colleague would be "doing [Tieu's] work" while she was "on maternity leave" and exclaimed that the colleague was doing Tieu a "favor." A-2687-2688; A-1078, A-1086, A-1107. In making some of these statements, Hoyt lashed out at and "berated" Tieu. A-2687; A-1078. And perhaps most damning, on April 30, 2020, the day after learning that Tieu would be returning from leave, A-1275, Hoyt and Loeb lamented that neither of them "wanted" nor "expected" her to return. A-2697; A-2579.

A jury could consider this deluge of negative comments about Tieu and her leave as proof of retaliation, especially when combined with Tieu's proof of temporal proximity. But, as explained above, the district court generously interpreted the hostile comments as pertaining only to Tieu's performance, not her leave.

Moreover, the district court rejected as "speculat[ion]" and "conjecture" that Hoyt and Loeb were lamenting Tieu's return from protected leave. Tieu, 2024 WL 580063, at *14. The district court instead accepted as fact Loeb's self-serving testimony that they were discussing "Tieu's decision to 'fil[e] a federal complaint against EDC and individuals.'" Id. Of course, this could not have been their motivation because Tieu did not file her lawsuit until July 12, 2021, A-3, more than a year later. In other words, contrary to the district court's finding, Tieu was not engaging in speculation. Rather, Loeb lied about the substance of her text exchange

38

with Hoyt, further permitting a jury to disregard Loeb's testimony and conclude that Defendants were covering up their unlawful motives.

### 3.    Pretext

Pretext can "constitute powerful evidence of discrimination." <u>Stratton v. Dep't for the Aging for the City of N.Y.</u>, 132 F.3d 869, 879 (2d Cir. 1997) (quotation marks omitted).  An employee "may prove . . . retaliation . . . by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatiory reasons for its action.  From such discrepancies, a [factfinder] could conclude that the explanations were a pretext for a prohibited reason." <u>Graziadio</u>, 817 F.3d at 430.

Here, Hoyt and Loeb gave Tieu negative reviews even though, by their own admission, they hardly worked with Tieu.  A-2684; A-514-515; A-165-166.  Wolf, the employee who worked most closely with Tieu, provided overwhelmingly positive feedback.  A-2684; A-516-517.  Once again, a jury could consider these facts as proof that the criticisms of Tieu's performance were a farce, and that Defendants were retaliating against her.

Once again, however, the district court interpreted these facts in the light most favorable to Defendants.  According to the district court, "Tieu does not contest that she reported to Hoyt," "or that Wolf's feedback was incorporated into her performance reviews," and "[t]he fact that Wolf did not deliver Tieu's

39

performance reviews does not establish that Defendants' reasons for their score were pretextual." <u>Tieu</u>, 2024 WL 580063, at *14. But Tieu's main point was not that Wolf should have conducted the review. Rather, the salient point is that Hoyt and Loeb who, by their own admission, barely worked with Tieu, gave her a negative performance review, while Wolf, who worked closely with Tieu, had the opposite view. A factfinder could draw a reasonable conclusion that the negative review by managers were false and issued in retaliation for Tieu's protected FMLA activity.[8]

### 4. Investigation

An obviously flawed investigation can be further proof of retaliation. <u>Menaker v. Hofstra Univ.</u>, 935 F.3d 20, 31-34 (2d Cir. 2019). Here, Defendants' "investigation" into Tieu's complaints was a transparent effort to exonerate Hoyt. For instance, they tried to convince Tieu that her diminished performance rating was not negative and suggested that she had misheard some of the discriminatory comments because of her hearing issues. A-2690; A-2812-2813. Loeb exclaimed, before the start of the inquiry, that she "could not believe" that Hoyt would discriminate. A-2811. Defendants' investigators also "declined to seek out

---

[8] Contrary to the district court's finding, Tieu did not merely present a "subjective disagreement with [her] reviews," <u>Tieu</u>, 2024 WL 5800063, at *9 (quoting <u>Petrisch v. JP Morgan Chase</u>, 789 F. Supp. 3d 437, 448 (S.D.N.Y. Jan. 11, 2011)), she offered substantial proof from EDC's own corporate files (and a disinterested witness) that Hoyt and Loeb knew little of her performance and that their criticisms of her performance were bogus.

potential witnesses" Tieu identified as "favorable" to her claims. A-2695; A-2568; A-1979; see Doe v. Columbia Univ., 831 F. 3d 46, 56-57 (2d Cir. 2016). And, perhaps most critically, Defendants falsified the final report of their internal investigation to make it appear as if Tieu was not complaining about pregnancy discrimination or leave violations but only that her supervisor (Hoyt) was "lazy." A-2695-2696; A-815-816. In fact, one of the investigators admitted at her deposition that they misquoted Tieu in the report. Id.

Yet again, the district court dismissed these probative facts by stating that "[it] is not the Court's role to . . . question the manner in which [an employer] conducts its internal investigations." Tieu, 2024 WL 580063, at *14 (quoting Koppar v. Orange Reg. Med. Ctr., No. 19 Civ. 112288, 2022 WL 348172, at *18 (S.D.N.Y. Feb. 2, 2022)). But it most certainly is. As this Court has found, where a court seeks "to minimize or explain away . . . clear procedural irregularities," it has "failed to draw all reasonable inferences in [the plaintiff's] favor and made improper findings of fact." Menaker, 935 F.3d at 35.

## III.   PREGNANCY DISCRIMINATION

Title VII prohibits pregnancy discrimination, 42 U.S.C. § U.S.C. 2000e(k), and "protect[s] against discrimination 'before, during, and after [a person's] pregnancy.'" Briggs v. Women in Need, Inc., 819 F. Supp. 2d 119, 128 (E.D.N.Y. 2011) (quoting Bond v. Sterling, Inc., 997 F. Supp. 306, 309 (N.D.N.Y. 1998)). It

41

also prohibits an employer from taking adverse actions based on stereotypical notions that mothers with small children are less committed to their jobs. Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 120–22 (2d Cir. 2004). An employer is liable where the employee's pregnancy or related condition at least "partly . . . motivated" an employment decision. Holcomb v. Iona Coll., 521 F.3d 130, 142 (2d Cir. 2008).

Here, for largely the same reasons stated above with respect to Tieu's FMLA claims, a jury could find that Defendants discriminated against Tieu based on her pregnancy. The adverse actions began after Tieu announced her pregnancy and requested leave. A-2684; A-1084-1085, A-1188-1189. Hoyt's angry comments accusing Tieu of "shirking" her responsibilities, not taking "ownership" of her work, and demanding that Tieu be "grateful" because her colleague was "doing [Tieu] a favor" by filling in while Tieu was away, A-2687; A-1107, are quintessential comments revealing Hoyt's belief that Tieu, a pregnant woman about to go on leave, is no longer as committed to her job. Back, 365 F.3d at 120–22. The private messages between Hoyt and Loeb stating that they neither "expected" nor "wanted" Tieu to return from leave and that Loeb would "support you in any way" are further proof of their hostility. A-2579. In combination with the timing of events, the pretextual nature of Defendants' criticisms of Tieu and the skewed investigation, a jury could find that the adverse job actions Tieu suffered – two

42

negative reviews, a diminished raise, a lost bonus and significantly diminished job responsibilities, among others – were caused, at least in part, by Defendants' discriminatory animus.[9]

## IV.   **RACE AND SEX DISCRIMINATION**

Title VII and Section 1981 prohibit an employer from discriminating based on race.  42 U.S.C. § 2000e; 42 U.S.C. § 1981.  Title VII also makes it unlawful to discriminate based on sex.   42 U.S.C. § 2000e.  An employer violates Title VII where the employee's race or sex was "a motivating factor for any employment practice," Vega, 801 F.3d at 85 (citation omitted), and Section 1981 where the employee's race was the but-for cause of her injury.  Comcast Corp. v. Nat'l Ass'n of African American-Owned Media, 140 S. Ct. 1009, 1015 (2020).  However, but-for causation does not require proof that discrimination was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the discriminatory motive.  Bostock v. Clayton Cty., 140 S. Ct. 1731, 1739 (2020).  There can be multiple "but-for" causes, each of which may be sufficient to support liability.  Id.

In the discrimination context, courts have recognized claims based on "combination" of protected grounds that "cannot neatly be reduced into distinct

---

[9] Hoyt is free, of course, to argue to a jury that he did not act with a discriminatory purpose because he purportedly had a "history of helping and treating Tieu well."  A-2539.  The jury would have to weigh Hoyt's explanation against the competing evidence of his incriminating comments and the suspicious timing of his adverse actions, among other things.

components." <u>Robertson v. Wells Fargo Bank, N.A.</u>, No. 3:14 Civ. 01861 (VLB), 2017 WL 326317, at *8 (D. Conn. Jan. 23, 2017) (quoting <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 109 (2d Cir. 2010)). Thus, for example, an employer engages in unlawful conduct where it takes adverse action based on the stereotype that Asian women should be docile. <u>See</u> <u>Kwon v. Univ. of Vermont and State Agricultural College</u>, 912 F. Supp. 2d 135, 144 (D. Vt. 2012) (denying summary judgment based, <em>inter alia</em>, on the use of a "racial stereotype" of Asians); <u>see</u> <u>also</u> Virginia W. Wei, Note, <u>Asian Women and Employment Discrimination: Using Intersectionality Theory to Address Title VII Claims Based on Combined Factors of Race, Gender and National Origin</u>, 37 B.C. L. Rev. 771, 801 ("Asian women are commonly characterized as passive and repressive").[10]

Here, the combination of Tieu's race and sex caused Defendants to treat her differently. Defendants gave Tieu negative performance evaluations (ultimately resulting in a diminished raise and lost bonus) by criticizing her communications style. Hoyt falsely accused Tieu of being "aggressive," A-518, and "bossing" around another employee.[11] But this was a common criticism of Asian women at the EDC. For instance, Hoyt became enraged that another female Asian employee

---

[10] Likewise, Tieu's disability, pregnancy and FMLA claims are logically intertwined. That Tieu (a woman undergoing a high-risk pregnancy who sought leave and adjustments to her schedule) was treated differently because of the combination of these traits is hardly surprising.

[11] In fact, that employee thanked Tieu for setting her up for success. A-2682.

disagreed with him. A-2701; A-2813. He described her as "difficult" and "combative," and, as with Tieu, gave her a negative performance review, ultimately causing the woman to resign. Id. Hoyt berated another Asian woman because she commented on a business matter in the workplace. A-2701; A-2813. Several other Asian women, including Tieu, asked to be transferred away from or complained about EDC supervisor Connelly because of his abusive behavior. A-2700-2701; A-997-998, A-1005-1007; A-2812. This mistreatment of Asian women and the notion that they are "difficult," "combative" or "aggressive" when they speak up— contrary to the discriminatory stereotype that they should be passive—is classic proof of race and sex discrimination.

The district court acknowledged that "describing a woman as 'aggressive' invokes invidious gender stereotypes." Tieu, 2024 WL 580063, at *8 (citing Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)). Nevertheless, the district court ruled that Tieu could not even meet her prima facie burden for several reasons, all of which are either factually or legally inaccurate.

First, the district court reasoned that "a single stray comment – especially one long removed from the relevant adverse actions – does not establish a prima facie case of discrimination." Id. (citing Johnson v. City of New York, No. 18 Civ. 9600, 2020 WL 2036708, at *4 (S.D.N.Y. Apr. 28, 2020)). But the comments here cannot fairly be described as either "single" or "stray." Tieu was described as

45

"aggressive" and accused of "bossing" around her colleague, A-518, and another

Asian female employee was similarly described as "difficult" and "combative." A-

2701; A-2813. Moreover, these employees were described using these "invidious

gender stereotypes," id. at *8, in connection with criticisms of their performance.

A-518; A-2701; A-2813. In other words, the "comments are therefore not 'stray

remarks' insufficiently tied to the adverse action as to lack probative value. Instead,

'[t]he comments alleged were (1) made repeatedly, (2) drew a direct link between

gender stereotypes and the conclusion that [[the plaintiff] is ill-suited for her

position . . .], and (3) were made by [a] supervisor[] who played a substantial role

in the [adverse action]. As such, they are sufficient to support a finding of

discriminatory motive.'" Bart, 96 F.4th at 578 (some brackets in original) (quoting

Back, 365 F.3d at 107, n.12). Indeed, the district court's decision to mislabel these

comments as "stray remarks" and then disregard them entirely, is precisely the type

of analytical shortcut that this Court has rejected. Tomassi, 478 F.3d at 116 ("We

did not mean to suggest that remarks should be categorized as stray or not stray

and then disregarded if they fall into the stray category.").[12]

---

[12] Johnson, cited by the district court, is inapposite. Unlike here, the discriminatory remarks were
"alleged to have occurred nearly seven months before Plaintiff's transfer." 2020 WL 2036708, at
*4. Moreover, the comments were made by the plaintiff's coworkers, id. at *2, and not by a
decisionmaker. Id. at *4 (citing Dixon v. Int'l Fed'n of Accountants, 416 F. App'x 107, 110 (2d
Cir. 2010) ("[S]tray comments [by a coworker who played no role in the plaintiff's termination]
do not create an inference of discrimination.")).

Next, the district court concluded, without citation to any authority, that Tieu could not "establish a prima facie case of race and gender discrimination by pointing to the experiences of other Asian women who worked at EDC." Tieu, 2024 WL 580063, at *8. But this is simply a misstatement of the law. In Littlejohn v. City of New York, 795 F.3d 297, 312 (2d Cir. 2015), this Court expressly found that "an inference of discrimination can arise from circumstances including, . . . [the employer's] invidious comments about others in the employee's protected group"; see Zubulake v. UBS Warburg LLC, 382 F. Supp. 2d 536, 544-45 (S.D.N.Y. 2005) (employer's mistreatment of "other employees" is "relevant to the issue of the employer's discriminatory intent).

Lastly, the district court reasoned that Tieu could "not establish that Defendants made any 'invidious comments about others in [her] protected group[s].'" Tieu, 2024 WL 580063, at *8 (quoting Littlejohn, 795 F.3d at 312). But that is precisely what Tieu was able to do, as even the district court was forced to acknowledge that accusations that a female employee is "'aggressive' invokes invidious gender stereotypes." Id.

## V. **RETALIATION**

Federal law also prohibits an employer from retaliating against an employee for protesting discrimination or seeking accommodations. Mihalik v. Credit Agricole Cheuvreux North America, Inc., 715 F.3d 102, 112 (2d Cir. 2013);

Limauro v. Consol. Edison Co. of New York, Inc., No. 20-CV-03558 (CM), 2021 WL 466952, at *10 (S.D.N.Y. Feb. 9, 2021). The employer is liable where retaliation was the "but for" cause of the adverse employment action, Piligian v. Icahn Sch. of Med. at Mount Sinai, 490 F. Supp. 3d 707, 718 (S.D.N.Y. 2020), but the plaintiff is not required to show that retaliation was the only cause. Zann Kwan, 737 F.3d at 846. Once again, retaliation may be proven "indirectly, by showing that the protected activity was followed closely by discriminatory treatment." Dodd v. City University of New York, 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020) (quoting Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010)).

Here, it is uncontested that Tieu engaged in repeated acts of protected activity. First, she sought accommodations in January and March 2019 (work from home) A-2458; A-1012, A-1017; 125:7-13; A-2685; A-1038; June 2019 (to be excused from a deposition) A-2687; A-1076; and November 2019 (leave extension because of tumor diagnosis). A-2692; A-2599-2601. In each instance, the EDC placed obstacles in her path before finally relenting. Tieu also protested discriminatory treatment in July 2019 (to HR and then EDC President James Patchett) (A-2689-2690; A-2599-2600; A-2811; on July 30, 2019 (to Loeb), A-2689; A-1097; August 1, 2019 (formal HR complaint), A-2690; A-2811; August 2, 2019 (Tieu's response to her first negative review), A-2691; A-2811-2812; A-2586-2588; February 2, 2020 (demand letter from Tieu's attorney), A-2691; A-2811-

48

2812; A-2586-2588; and June 3, 2020 (EEOC filing). A-2623-2646. This protected activity tracks Tieu's exercise of her FMLA rights, as explained above. And, for the same reasons stated above (timing, comments, pretext and sham investigation), a jury could easily conclude that Defendants retaliated against Tieu for protesting discrimination and seeking accommodations.

The district court, however, found that certain retaliatory actions by Defendants, "including assigning her no direct reports, 'ignor[ing] one of her emails regarding her benefits, requiring her to attend 'two-on-one weekly meetings,' and requiring her to 'go through trainings and orientations that she has already attended – do not rise above the level of 'trivial harm.'" Tieu, 2024 WL 580063, at *13 (citing Alvarado v. United Hospice, Inc., 631 F. Supp. 3d 89, 118 (S.D.N.Y. 2022)).

However, in Muldrow v. City of St. Louis, Missouri, 601 U.S. ---, 144 S. Ct. 967 (2024), the Supreme Court recently held that an aggrieved employee "does not have to show . . . that the harm [she suffered] was significant," "[o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." Id. at 974. Rather, she "need show only some injury respecting her employment terms or conditions." Id. at 977. Indeed, in concurring opinion, Justice Kavanaugh opined that the aggrieved employee should not be required to show any harm to assert a claim so long as the action "changes

the compensation, terms, conditions, or privileges of employment." Id. at 980. Regardless, Justice Kavanaugh recognized that even the "some-harm requirement appears to be a relatively low bar," which can be satisfied in myriad ways, "whether in money, time satisfaction, schedule, convenience, commuting costs or time, prestige, status, career prospect, interest level, perks, professional relationships, networking opportunities, effects on family obligations, or the like." Id.

Applying this analysis, it would certainly be reasonable for a factfinder to conclude that removing Tieu's direct reports, placing her under a heightened level of "two-to-one" supervision, and requiring retraining, meets this minimal showing.

The district also rejected Tieu's claim that Defendants failed to transfer her in retaliation because, according to the district court, Tieu "never formally applied for a transfer, as required by EDC's internal policy." Tieu, 2024 WL 580063, at *13. However, it would have made little sense for Tieu to apply for a transfer given that then EDC President Patchett "promised" Tieu a transfer when she "made a complaint about [Hoyt's] discriminatory animus towards [her] maternity leave." A-1174.

50

## <u>CONCLUSION</u>

For the foregoing reasons, Tieu respectfully requests that this Court reverse

the district court's Judgment and remand this action for a trial.

Dated: June 26, 2024
      New York, New York          Respectfully submitted,

                                    **WIGDOR LLP**

                                    By:_____
                                        Valdi Licul

                                  85 Fifth Avenue
                                  New York, NY 10003
                                  Telephone: (212) 257-6800
                                  Facsimile: (212) 257-6845
                                  vlicul@wigdorlaw.com

                                  *Counsel for Plaintiff-Appellant*

51

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,887 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in the Times New Roman font, size 14.

Dated: June 26, 2024
      New York, New York       Respectfully submitted,

                                        **WIGDOR LLP**

                                        By:_____
                                            Valdi Licul

                                        85 Fifth Avenue
                                        New York, NY 10003
                                        Telephone: (212) 257-6800
                                          Facsimile: (212) 257-6845
                                        vlicul@wigdorlaw.com

                                        *Counsel for Plaintiff-Appellant*

# SPECIAL APPENDIX

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Order of the Honorable Analisa Torres, dated
February 13, 2024 ................................................ SPA-1

Judgement, entered on February 13, 2024, Appealed
From ....................................................................... SPA-33

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LIA TIEU,

                              Plaintiff,

                -against-

NEW YORK CITY ECONOMIC
DEVELOPMENT CORPORATION,
WINTHROP HOYT and RACHEL LOEB, in
their individual and professional capacities,

                              Defendant.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/13/2024
```

21 Civ. 5951 (AT)

**ORDER**

ANALISA TORRES, United States District Judge:

In this employment discrimination case, Plaintiff, Lia Tieu, alleges that her employer, New York City Economic Development Corporation ("EDC"), and its employees, Winthrop Hoyt and Rachel Loeb, discriminated against her on the basis of her sex, race, and pregnancy in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(2); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 *et seq.* ("Section 1981"); the New York State Human Rights Law, N.Y. Exec. Law § 296 (the "NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 (the "NYCHRL"); and retaliated against her for exercising her rights under these statutes. *See generally* Compl., ECF No. 1. Before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. ECF No. 78. For the reasons stated below, Defendants' motion is GRANTED.

SPA-2

## BACKGROUND[1]

I.   Factual Background

A.  Tieu's Hiring and Initial Accommodation Requests

Tieu was hired as a vice president in asset management at EDC—a nonprofit organization that manages and develops City-owned real estate assets—in July 2018.  Def. 56.1 ¶¶ 1, 3, ECF No. 86.  In that role, Tieu was "responsible for supporting the oversight, development, and direct management" of real estate strategies and asset-management plans. Ex. M, ECF No. 79-13.[2]

Tieu initially reported to Darryl Connelly, a senior vice president in asset management revenue.  Def. 56.1 ¶ 15.  In October 2018, Connelly drafted a "performance improvement plan" for Tieu, noting concerns with her communication style.  Ex. N, ECF No. 79-14.  Connelly never delivered the plan to Tieu because she began reporting to Defendant Winthrop Hoyt in October or November 2018.  Def. 56.1 ¶¶ 21–22, 32.

In January 2019, Tieu informed Hoyt that she was pregnant.  Hoyt Dep. at 138:8–14, Ex. C, ECF No. 79-3; Pl. 56.1 ¶ 7, ECF No. 103.  Soon after, she asked to work from home for two days per week for two weeks due to pregnancy-related morning sickness.  Def. 56.1 ¶ 68. Tieu states that Rebecca Osborne, an HR assistant vice president, denied her request, explaining that EDC did not have a formal work-from-home policy.  Pl. 56.1 ¶ 8.  EDC claims that Tieu did not submit a doctor's note in connection with her request.  *Id.*  EDC granted Tieu's subsequent request to work in the office from 10 a.m. to 3 p.m. for three months.  Def. 56.1 ¶¶ 74–75.

---

[1] Citations to a paragraph in a Rule 56.1 statement also include the other party's response and any sur-replies.

[2] Citations to "Ex. #" refer to the exhibits to the declaration of Kuuku Minnah-Donkoh, ECF No. 79.

2

SPA-3

In February 2019, Tieu suddenly lost hearing in her left ear.  Pl. 56.1 ¶ 12.  Around March 1, 2019, she provided Osborne a letter from her doctor asking that EDC "excuse her from work" for two weeks.  *Id.* ¶ 13; *see* Ex. AA, ECF No. 79-28.  Tieu states that Osborne "immediately" called her "unfit for work," "threw" the letter back at her, and told Tieu to take sick and vacation days.  Tieu Dep. at 146:12–147:7, Ex. F, ECF No. 79-6.  According to Osborne, "unfit for work" is an outdated Australian term "relating to a doctor's clearance for duties."  Pl. 56.1 ¶ 15.  Tieu also notified Hoyt that she had requested the accommodation but could "be effective and continue to perform [her] job duties at home"; Hoyt replied that this was "of course fine with [him]."  Ex. BB, ECF No. 79-29.

Tieu submitted a second doctor's note stating that she could return to the office on March 18, 2019, but was "advised strongly to work from home" until then.  Def. 56.1 ¶ 99; Ex. EE, ECF No. 79-32.  Upon receiving the second doctor's note, EDC granted Tieu's request to work from home for that period.  Def. 56.1 ¶ 100; Ex. GG, ECF No. 79-34.  EDC also credited back two vacation/sick days that Tieu used.  Def. 56.1 ¶ 101.

In May 2019, Khary Hair, an HR employee, met with Tieu to discuss her upcoming parental leave.  Pl. 56.1 ¶ 22.  EDC requires that an employee seeking parental leave submit forms including a manager's signature.  *Id.* ¶ 23.  Tieu testified that when she asked Hoyt to sign her form on May 7, he declined, explaining that he believed she was only eligible for twelve weeks of leave instead of sixteen.  Tieu Dep. at 161:5–162:5.  After seeking clarification and learning that Tieu was, in fact, eligible for sixteen weeks, Hoyt signed the form on May 13.  Def. 56.1 ¶¶ 112–15; Hoyt Dep. at 152:22–155:10.

3

B.  First Performance Review and Complaint

On June 5, 2019, an EDC paralegal informed Tieu that the company had been court-ordered to produce a witness for deposition in a lawsuit involving one of her real estate assets. Def. 56.1 ¶ 119.  Tieu replied that other employees with more knowledge of the property might be more suitable witnesses; the paralegal responded that the project manager (Tieu) "should be doing the deposition."  Ex. MM, ECF No. 79-40.  Tieu then stated that she was "8 months pregnant and [her] water could break at any moment," so she "may not be available" for the deposition, which was scheduled for July 12.  *Id.*  Hoyt agreed to "make [him]self available" for the deposition instead, although Tieu stated that if she was "around on July 12," she could be the witness.  *Id.*

Tieu testified that on July 9, 2019, Hoyt "yelled [at her]," "berated [her]," "told [her she] was shirking [her] responsibilities, he didn't want to go on the deposition," and that Tieu "had to do it" and "take ownership of [her] work."  Tieu Dep. at 186:12–24.  On July 11, Tieu emailed the legal department that she had not "gone into labor yet so [she would] be the witness for the deposition."  Ex. NN, ECF No. 79-41.  She testified that she "felt pressured to go."  Tieu Dep. at 189:19–24.

On July 23, 2019, Crystal Adams, an EDC risk manager, emailed Tieu a list of comments related to the insurance coverage of one of Tieu's real estate assets.  Def. 56.1 ¶ 173; *see* Ex. SS, ECF No. 79-46.  In response to Adams' email, Tieu sent an email to a group including Hoyt and Sabrina Lippman, another vice president in asset management.  The email read: "What is Crystal talking about? Sara [Zhu, EDC's insurance risk manager prior to Adams] never required us to do the things mentioned below.  Do you agree or disagree?  Please advise.  I will let Sabrina handle this."  Def. 56.1 ¶ 174; *see* Ex. SS.  According to Tieu, Hoyt "accused [her] of bossing

4

SPA-5

[Lippman] around and demanding that she do" Tieu's work, and told Tieu she "should be grateful that [Lippman was] doing [her] work, that she [was] doing [Tieu] a favor while [Tieu was] on maternity leave."[3] Tieu Dep. 171:9–173:4; 215:7–16. Hoyt denied that he accused Tieu of "bossing people around," but testified that he told Tieu "that if her colleagues were doing her job . . . while she was still at EDC, . . . it would be the equivalent of asking them a favor." Hoyt Dep. at 157:8–25. He explained that he found Tieu's email inappropriate because it was "her scope of work to perform and there was no reason for her to have [Lippman] do it." Id. at 159:23–160:5, 161:9–17.

On July 25, 2019, Hoyt met with Tieu to deliver her performance review. Tieu's overall review rating was a "3" out of "5," or "Consistently Meets Expectations." Def. 56.1 ¶ 182; Ex. QQ at 4, ECF No. 79-44. Hoyt rated Tieu a "3" for "Teamwork" and a "4" for "Results," but a "2" for "Communication." Ex. QQ at 2–3. In the "Communication" section, Hoyt explained that "[t]here have been occasions in this period where [Tieu] has become frustrated in communications with tenants and other parties which have resulted in some communication challenges." Id. at 2. Hoyt noted that Tieu had "asked to be removed from challenging projects," including the "Audubon Ballroom and Columbia" projects. Id. at 3. On the Columbia project, Hoyt testified that during a meeting in December 2018, Tieu "took a very aggressive tone" toward representatives of Columbia University and suggested that EDC would hold Columbia in default. Hoyt Dep. at 139:4–140:6. On the Audubon Ballroom project, in March 2019, a project contractor had complained to Matt Kwatinetz, then-executive vice president of Tieu's department, that Tieu had become "increasingly dismissive" and needed to "check her tone."

---

[3] In a text message sent that day, Tieu recounted that Hoyt told her: "[Lippman] doesn't work for you. She's doing you a favor. You should continue to work while you're here." Ex. TT, ECF No. 79-47.

Ex. T, ECF No. 78-21.  Kwatinetz asked Tieu to "tone down the language please"; Tieu replied that she was "merely following EDC protocol."  Ex. U, ECF No. 79-22.

After the performance evaluation, Tieu received a pay raise from $115,000 to $118,450, a smaller increase than she expected.  Def. 56.1 ¶ 193; *see* ECF No. 84-9 at 3.   Tieu then raised complaints to various EDC employees, including Hair; Rosa Vasquez, then-vice president of human resources; and Defendant Rachel Loeb, then EDC's chief operating officer.  Pl. 56.1 ¶ 54; Def. 56.1 ¶¶ 183–84; Tieu Dep. at 205:14–209:4.  To Vasquez, Tieu complained that she believed Hoyt was treating her differently because of her pregnancy and indicated that she wanted to file a formal complaint against him and Kwatinetz.  Def. 56.1 ¶ 185.

On August 1, 2019, Tieu emailed Hair to discuss "taking medical leave before [her] maternity leave starts."  Ex. XX, ECF No. 79-51.  She attached a letter from her doctor noting that she "requires twice weekly visits and ultrasounds" and recommending that she start her leave on August 5.  *Id.*  Tieu later testified that she had initially planned to work until her water broke because she "didn't want to use up [her] maternity leave," but that Hair, Vasquez, and Loeb had "forced" her to get the doctor's note advising an earlier leave date.  Tieu Dep. at 244:3–19, 249:15–17.  Defendants claim that Hair only told Tieu that salary continuation— allowing her to continue receiving pay before her parental leave began—was available to her. Pl. 56.1 ¶ 188; *see* Ex. WW, ECF No. 79-50.  EDC approved Tieu's request to go on leave beginning on August 5, 2019.  Def. 56.1 ¶ 192.

Shortly before Tieu went on leave, Vasquez and Erica Edwards-O'Neal, who was then EDC's Equal Employment Opportunity ("EEO") officer, met with Tieu regarding her complaint against Hoyt and Kwatinetz.  *Id.* ¶¶ 194–98.  During the interview, Tieu stated that she believed Hoyt discriminated against her by giving her a poor review because of her pregnancy, request for

6

leave, and race. *Id.* ¶ 199.  Tieu alleged that women were not promoted under Kwatinetz, and that he had pushed out other Asian women on the team. *Id.*  Edwards-O'Neal and Vasquez also interviewed Hoyt and Kwatinetz. *Id.* ¶ 202.  Edwards-O'Neal and Vasquez finished their investigation on October 29, 2019, concluding that they were "unable to substantiate any claim of discrimination based on race, gender or pregnancy."  Ex. AAA, ECF No. 79-54.  On November 6, 2019, Edwards-O'Neal mailed Tieu a copy of a "Complaint Outcome Memo," although she did not send the full investigation report.  Ex. BBB, ECF No. 79-55.

### C.  Leave

Tieu gave birth in August 2019 and was diagnosed with a tumor, which required surgery and led her to experience postpartum depression and anxiety.  Pl. 56.1 ¶ 72.  Tieu underwent brain surgery and was unable to return to work on the planned date. *Id.* ¶¶ 72–74.  She emailed Hair and James Patchett (EDC's then-president) to request medical leave and submitted a note from her therapist recommending twenty-four weeks of leave.  Def. 56.1 ¶ 216.  Hair responded that because Tieu had requested "a new disability claim based on a new medical condition," her doctors would need to fill out a new set of forms.  Ex. GGG, ECF No. 79-60.  Tieu's neurologist and brain surgeon submitted the forms to Aetna on December 17, 2019.  Def. 56.1 ¶ 227.

By email dated December 18, 2019, Hair notified Tieu that he had "not received official word from Aetna" that he could push back her return date.  ECF No. 84-10.  Hair advised Tieu that her FMLA job protection had ended on October 25 and her EDC-provided parental leave would end on December 20, and asked her to provide "some documentation" to "continue holding [her] position on our books." *Id.*

On December 19, Tieu submitted a doctor's note from her neurosurgeon and requested a provisional extension of her return date until March 4, 2020.  Def. 56.1 ¶¶ 234–35; Ex. HHH,

SPA-8

ECF No. 79-61.  EDC approved the extension.  Def. 56.1. ¶¶ 236.  On March 2, 2020, she

requested another leave extension for additional psychiatric care; EDC again approved the

extension until April 30, 2020.  *Id.* ¶¶ 237–38.

On April 28, 2020, Tieu submitted a return-to-work form.  *Id.* ¶ 239.  EDC granted Tieu's

request to work three days per week until May 29, 2020, and asked Tieu to sign another

"Flexible Work Arrangement" agreement for the reduced schedule.  *Id.* ¶¶ 240–41; *see*

Ex. KKK, ECF No. 79-64.

D.  Return to Work, Second Performance Review, and Second Complaint

Tieu went back to work—remotely and on a reduced schedule—around May 4, 2020.

Def. 56.1 ¶ 239.  After she returned, Tieu asked Osborne about transferring departments, a move

that Tieu had previously discussed with Patchett.  Tieu Dep. at 283:23–285:23. According to

Tieu, Osborne informed her that a COVID-19 hiring freeze prohibited the transfer.  *Id.* at

285:11–286:17; Def 56.1 ¶ 273.[4]  Tieu did not formally apply for a transfer, and the parties

dispute whether HR told her that she needed to.  *Id.* ¶¶ 270–73.

Tieu also testified that several aspects of her job had changed upon her return.  First, she

testified, "80 percent of [her] projects were taken away"; Defendants state that the reduced

workload was due to her reduced schedule.  Tieu Dep. at 259:12–16; Def. 56.1 ¶ 262.  Second,

she did not have any direct reports assigned to her (although Defendants contend that she did not

have any direct reports prior to going on leave, either).  Def. 56.1 ¶ 258.  Third, she was now

required to attend two-on-one weekly check-ins with Hoyt and Julie Stein, who had been

promoted to co-heads of the portfolio management department.  Def. 56.1 ¶ 214; Pl. 56.1 ¶ 113.

Tieu claims (and Defendants dispute) that other employees had one-on-one meetings with their

---

[4] Per EDC policy, transfers can only be made to vacant positions.  Def. 56.1 ¶ 270.

8

supervisors and that she otherwise had limited interaction with Stein. Pl. 56.1 ¶ 114. Tieu felt that she was under "intense scrutiny" from Hoyt and Stein. Tieu Dep. at 259:21–25.

On June 4, 2020, Tieu requested an extension of her part-time schedule while she was undergoing IVF treatment. Def. 56.1 ¶ 246. EDC granted the extension. *Id.* ¶ 247. In August 2020, EDC emailed employees instructions for communicating their plans to return to work in the office. *Id.* ¶ 248. On August 13, Tieu advised Osborne that she was pregnant and requested an exemption from EDC's return-to-work requirement because of her health conditions, her husband's health conditions, and her infant child. *Id.* ¶ 249. EDC granted the exemption through December 20, 2020, and later extended it through March 30, 2021. *Id.* ¶¶ 250–55.

On February 1, 2021, Tieu received another performance review. Def. 56.1 ¶ 289; Ex. VVV, ECF No. 79-75. Hoyt had solicited feedback on Tieu's performance from a variety of individuals, including Stein and Loeb. Def. 56.1 ¶ 290. Hoyt gave Tieu an overall rating of 2.67, including a "2" for "Communication," which signifies "Sometimes meets expectations or improvement needed." *Id.* ¶ 296; Ex. VVV. The review noted that "[f]eedback from key stakeholders outside of the team also identified some areas for development in communication," including "asking questions before making assumptions about situations and being mindful of not being 'short' with people." Ex. VVV at 4.

Employees who received a score of "3" or higher on their performance review were eligible for a one-time bonus between $1,200 and $1,500. Def. 56.1 ¶¶ 322–23. Because Tieu's overall score was lower than "3," she was ineligible to receive the bonus. *Id.* ¶ 324.

On February 18, 2021, Tieu emailed Vasquez, complaining that she had received a retaliatory review and submitting a doctor's note recommending that she begin her leave that day due to the high-risk nature of her pregnancy, anxiety, and emotional stress. *Id.* ¶ 325. Vasquez

forwarded Tieu's email to the new EEO officer, Mirna Santiago, for investigation. *Id.* ¶ 330. Santiago reviewed Tieu's performance evaluation, other evaluations Hoyt had prepared, and Tieu's "rebuttal" to her evaluation; she also interviewed three of the individuals who had provided feedback. *Id.* ¶ 331. Tieu declined to be interviewed. *Id.* Santiago ultimately determined that Tieu's complaint could not be substantiated. *Id.* ¶ 333; *see* Ex. EEEE, ECF No. 79-84.

Tieu admits that she has never heard Hoyt or Loeb make any derogatory comments about Asians, women, or pregnant women. *Id.* ¶ 337. She states, however, that she "observed a culture at EDC that repeatedly treated her and other Asian women less well and criticized them for being 'too aggressive.'" *Id.*; *see* Tieu Supp. Decl. ¶¶ 17–20, ECF No. 88 (detailing how "[o]ther Asian women at EDC have felt mistreated and harassed by Hoyt").

II.   Procedural History

On June 3, 2020, Tieu filed a charge of discrimination with the EEOC; the EEOC issued a notice of right to sue on January 13, 2021.[5] Compl. ¶ 13. She commenced this action on July 12, 2021, alleging unlawful discrimination and retaliation on the basis of her sex, race, and pregnancy in violation of the FMLA, Title VII, the ADA, Section 1981, the NYSHRL, and NYCHRL. *See id.*

Defendants move for summary judgment on all counts. ECF No. 78; *see* ECF Nos. 79–81.

---

[5] On April 12, 2021, the parties entered into an agreement tolling all applicable statutes of limitations until July 12, 2021. Compl. ¶ 13 n.1.

## DISCUSSION

I.   <u>Standard of Review</u>

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party initially bears the burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record.  Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002).  If the nonmoving party has the ultimate burden of proof at trial, the movant may also satisfy its own summary judgment burden by demonstrating that the nonmovant cannot produce admissible evidence that supports the existence of a dispute of material fact.  *Celotex*, 477 U.S. at 322–23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo*, 315 F.3d at 105.  "Although a party opposing summary judgment need not prove its evidence in a form admissible at trial or under the evidentiary standard which will be required, it must show facts sufficient to enable a reasonable mind to conclude that a material dispute of fact exists." *Healy v. Chelsea Res. Ltd.*, 736 F. Supp. 488, 491–92 (S.D.N.Y. 1990) (citation omitted).  In deciding the motion, the Court views the record in the light most favorable to the nonmoving party.  *Koch*, 287 F.3d at 165.

11

The Court must be "cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question," and must "carefully scrutinize[]" the non-movant's affidavits and depositions for "circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citation omitted). That said, summary judgment is warranted if the opposing party "relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Figueroa v. N.Y. Health and Hosps. Corp.*, 500 F. Supp. 2d 224, 228 (S.D.N.Y. 2007) (internal quotation marks and citation omitted). To defeat summary judgment, the opposing party must set forth "concrete evidence from which a reasonable juror could return a verdict in [her] favor." *Anderson*, 477 U.S. at 256.

II.   <u>Discrimination</u>

Claims Two, Four, and Ten of the complaint allege that Defendants discriminated against Tieu in violation of Title VII, the ADA, and § 1981, respectively. *See* Compl. ¶¶ 119–23, 129– 33, 159–62.

A.   Title VII

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."[6] 42 U.S.C. § 2000e–2(a)(1). Courts analyze employment discrimination claims brought under Title VII using "the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).

Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the

---

[6] Under the Pregnancy Discrimination Act, "Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 210 (2015).

defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination.

*Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) (citation omitted).

      1.  Prima Facie Case

A plaintiff establishes a prima facie case if she

introduces evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor. [The plaintiff] must show: (1) that [she] belonged to a protected class; (2) that [she] was qualified for the position [she] held; (3) that [she] suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.

*Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (citations omitted).

      For the purposes of summary judgment, Defendants do not dispute that Tieu belongs to several protected classes (based on her race, gender, and pregnancy), nor that she was qualified for her position. Def. Mem. at 21, ECF No. 81. The parties disagree, however, about the third and fourth elements of the prima facie case.

      i.  Adverse Employment Action

      Beginning with the third element, Tieu argues that she suffered "two negative reviews, a diminished raise, a lost bonus[,] and significantly diminished job responsibilities," contending that each constitutes an adverse employment action. Pl. Opp. at 26, ECF No. 89. Defendants argue that only the first performance review, for which she received an allegedly "minimal raise," constitutes an adverse employment action. Def. Mem. at 22 & n.13.

      "To qualify as an adverse employment action, the employer's action toward the plaintiff must be 'materially adverse' with respect to 'the terms and conditions of employment.'" *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (per curiam) (quoting *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)). The action must be "more

disruptive than a mere inconvenience or an alteration of job responsibilities." *Davis*, 804 F.3d at 235 (quoting *Sanders*, 361 F.3d at 755) (internal quotation marks omitted); *see also Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (citation omitted).  Additionally, "a plaintiff must set forth objective proof that the alleged action was materially adverse." *Potash v. Florida Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) (citing *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008)) (emphasis omitted).

"Negative evaluations can be adverse employment actions only if they give rise to material adverse changes in work conditions." *Kpaka v. City Univ. of New York*, No. 14 Civ. 6021, 2016 WL 4154891, at *7 (S.D.N.Y. Aug. 2, 2016) (citation omitted); *see also Borzon v. Green,* No. 16 Civ. 7385, 2018 WL 3212419, at *8 (S.D.N.Y. June 29, 2018), *aff'd*, 778 F. App'x 16 (2d Cir. 2019) ("Put differently, a negative performance review is not itself an adverse employment action.").  "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (citation omitted).

Here, Tieu has offered evidence that her first performance review resulted in a smaller raise than expected, and that the second resulted in the denial of a one-time bonus.  Although Tieu never suffered a pay decrease, her receipt of a smaller raise and the denial of a bonus nonetheless constitute "materially adverse changes" for the purposes of her prima facie case. *See, e.g.*, *Boutin v. Comcast Cable Commc'ns Mgmt., LLC*, No. 21 Civ. 1630, 2023 WL 4564375, at *7 (D. Conn. July 17, 2023) (holding that a "0.5% raise resulting from [plaintiff's] negative performance evaluation," which was "substantially lower" than expected, was an

adverse action); *Burgos v. Sullivan & Cromwell*, No. 99 Civ. 11437, 2001 WL 709268, at *7 (S.D.N.Y. June 25, 2001) (finding that receipt of a raise smaller than that given to another employee could constitute an adverse employment action).

Tieu has also stated that "80 percent of [her] projects were taken away" after she returned from leave, although the parties dispute the exact contours of her pre- and post-leave workloads. Tieu Dep. at 259:12–16. The Circuit has held that "significantly diminished material responsibilities" may signify an adverse employment action. *Vega*, 801 F.3d at 85. *But see Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001), *aff'd*, 51 F. App'x 55 (2d Cir. 2002) (a "decrease in workload, without any formal demotion or reduction in pay, does not constitute an actionable adverse employment action."). Although Tieu does not allege that she was demoted or that her pay was reduced, the Court assumes that the reassignment of the majority of her projects also constitutes an adverse employment action.

ii.   Inference of Discriminatory Intent

The fourth element of the prima facie case requires Tieu to present evidence that her performance reviews were made "under circumstances giving rise to an inference of discriminatory intent." *Holcomb*, 521 F.3d at 138 (citations omitted). Such circumstances may include "the employer's criticism of the plaintiff's performance in ethnically degrading terms," "invidious comments about others in the employee's protected group," "the more favorable treatment of employees not in the protected group," or "the sequence of events leading to" the adverse action. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citation omitted). At summary judgment, the Court must determine "whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer

a discriminatory motive," not to "decide what inferences should be drawn." *Id.* at 38. The plaintiff's burden at this step is "de minimis." *Id.*

Tieu's evidence on pregnancy discrimination passes this low bar, if barely. First, she notes that the sequence of events could permit a rational factfinder to infer a discriminatory motive, as the reviews and work reduction came "after Tieu announced her pregnancy and requested leave." Pl. Opp. at 25. Tieu also testified that after she said she may not be available to sit for a deposition due to her advanced pregnancy, Hoyt accused her of "shirking" her responsibilities and not taking "ownership" of her work. Tieu Dep. at 186:12–24. Around two weeks later, Hoyt delivered Tieu's first negative performance review. Drawing all inferences in Tieu's favor, a rational factfinder could interpret Hoyt's comments as suggesting that Tieu, a soon-to-be mother, was not "show[ing] the same level of commitment" she had previously shown because of her pregnancy. *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 120 (2d Cir. 2004).

On race and non-pregnancy gender discrimination, however, Tieu offers no admissible evidence suggesting a discriminatory motive. Tieu concedes that she has never heard Hoyt or Loeb make discriminatory comments about women or Asians. Def. 56.1 ¶ 337. Instead, Tieu points to a portion Hoyt's deposition in which he characterizes her tone as "aggressive", *see* Hoyt Dep. 139:5–9; and (2) her own supplemental declaration, which states that several Asian women had negative experiences with Hoyt at EDC, Tieu Supp. Decl. ¶¶ 17–20. Although describing a woman as "aggressive" invokes invidious gender stereotypes, *cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), a single stray comment—especially one long removed from the relevant adverse actions—does not establish a prima facie case of discrimination. *Johnson v. City of New York*, No. 18 Civ. 9600, 2020 WL 2036708, at *4 (S.D.N.Y. Apr. 28,

2020) (citation omitted).  Nor can Tieu establish a prima facie case of race and gender

discrimination by pointing to the other experiences of Asian women who have worked at EDC.

*See* Tieu Supp. Decl. ¶¶ 17–20.  Even if these secondhand stories were admissible, Tieu's

supplemental declaration does not establish that Defendants made any "invidious comments

about others in [her] protected group[s]," nor that employees not in her protected groups were

treated more favorably.[7]  *See Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)

(quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).

### 2.   Legitimate Nondiscriminatory Reason

Once the plaintiff establishes a prima facie case, "the burden then shifts to the defendant

to offer a legitimate, nondiscriminatory reason for" its actions.  *Ruiz v. Cnty. of Rockland*, 609

F.3d 486, 492 (2d Cir. 2010) (citation omitted).  "If the defendant proffers such a reason, the

presumption of discrimination drops out of the analysis, and the defendant will be entitled to

summary judgment unless the plaintiff can point to evidence that reasonably supports a finding

of prohibited discrimination."  *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (cleaned

up).

Defendants argue that they have established legitimate, nondiscriminatory reasons for the

scores Tieu received in her two performance reviews: "EDC received complaints about Tieu's

communication style," and "Hoyt also observed communication issues with Tieu."  Def. Mem. at

19–20.  Although at this step Defendants "need not persuade the court that [they were] actually

motivated by the proffered reasons," *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254

(1981), Defendants point to substantial evidence that concerns about Tieu's communication style

---

[7] In the complaint, Tieu alleges that her "less competent white and male co-workers"—including her former supervisor—have been "protected and even rewarded" at EDC.  Compl. ¶¶ 108–09.  Tieu offers no evidence, however, that she was similarly situated to a white or male employee who received allegedly preferential treatment. *See Colon v. Fashion Inst. of Tech. (State Univ. of New York)*, 983 F. Supp. 2d 277, 289 (S.D.N.Y. 2013).

were longstanding and grounded in specific incidents, including the December 2018 meeting

with the Columbia representatives and the March 2019 complaints from the Audubon Ballroom

contractor.  *See* Ex. N (October 2018 draft performance improvement plan); Ex. R, ECF No. 79-

19 (February 2019 ninety-day review); Ex. T (March 2019 complaint from contractor about

Tieu); Hoyt Dep. at 139:4–141:3 (describing December 2018 Columbia meeting).  In addition,

Defendants have provided a legitimate, nondiscriminatory reason for the reduction in Tieu's

workload upon her return from leave: she was working only three days a week, instead of her

previous five.  *See* Pl. 56.1 ¶ 102.

       3.  Pretext

      Because Defendants have articulated legitimate, nondiscriminatory reasons for the

adverse action, the burden shift back to Tieu to prove such reasons are pretextual.  *Abrams*, 764

F.3d at 251 (citation omitted).  On this record, Tieu has not carried her burden.  She points,

again, to Hoyt's alleged comment accusing her of "'shirking' her responsibilities."  Pl. Opp. at

25.  But to the extent that Tieu relies on the same "angry comments" that establish her prima

facie case, *id.*, "it is well-settled that a plaintiffs' production of minimal evidence suggesting

discriminatory intent, while sufficient to make a prima facie case, may not be enough in itself to

satisfy the third prong of *McDonnell Douglas*."  *Petrisch v. JP Morgan Chase*, 789 F. Supp. 2d

437, 448 (S.D.N.Y. 2011).  Although the alleged comments could be interpreted to suggest bias

on account of pregnancy, Tieu does not "demonstrate a sufficient nexus" to her subsequent

performance reviews.  *Id.*  The performance reviews note issues with Tieu's communication

skills, not her work ethic or productivity; indeed, the first review noted that Tieu's "Results"

"consistently exceeded expectations" and that she was "excellent at executing work plans and

keeping projects on track."  Ex. QQ at 3.

At bottom, Tieu may "vehemently disagree[] with Defendants' assessment of [her] performance." *Pearson v. Lynch*, No. 10 Civ. 5119, 2012 WL 983546, at *10 (S.D.N.Y. Mar. 22, 2012)). But "[t]he law is clear that a plaintiff's subjective disagreement with [her] reviews is not a viable basis for a discrimination claim." *Petrisch*, 789 F. Supp. 2d at 448 (cleaned up).

On the workload reduction, Tieu does not contest that she worked fewer days per week—at her own request—upon returning from leave. Tieu testified that she was "still working almost a full-time schedule, since she was working on her days off and on the weekends." Pl. 56.1 ¶ 103. The fact that Tieu worked beyond her scheduled hours, however, does not establish that Defendants' justification for reducing her workload was pretextual.

Considering the record in its entirety and granting Tieu all the inferences to which she is entitled, the Court finds that Tieu has not produced evidence to support a finding that her performance reviews or workload reduction were influenced by discrimination on the basis of her race, gender, or pregnancy. Accordingly, Defendants' motion for summary judgment as to Plaintiff's Title VII discrimination claims is GRANTED.

B.  Section 1981

Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. The Supreme Court has construed this provision to forbid racial discrimination in the making of public and private contracts. *St. Francis Coll. v. Al–Khazrcji*, 481 U.S. 604, 609 (1987).

The Second Circuit analyzes Section 1981 claims under the *McDonnell Douglas* framework. *See, e.g.*, *Ruiz*, 609 F.3d at 491. The Court, therefore, GRANTS Defendants'

motion for summary judgment on Tieu's Section 1981 for the reasons detailed in its analysis of Tieu's Title VII racial-discrimination claim.  *See supra* Part II.A.

C.  ADA

The ADA prohibits discrimination against any "qualified individual on the basis of disability," among other things, "employee compensation . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Claims alleging disability discrimination in violation of the ADA are also subject to the *McDonnell Douglas* burden-shifting analysis. *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013).  To establish a prima facie case under this standard, the plaintiff must show by the preponderance of the evidence that "(1) [her] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of [her] disability."  *Id.* (quoting *Sista v. CDC Ixis N. Am.*, Inc., 445 F.3d 161, 169 (2d Cir. 2006)). "Adverse employment action" has the same meaning under the ADA as it does under Title VII. *See Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 49 (2d Cir. 2014).

Tieu's complaint alleges that Defendants "discriminated against Plaintiff on the basis of her disability and/or perceived disability in violation of ADA," Compl. ¶ 130, and her response brief suggests that this claim overlaps with her pregnancy-based gender discrimination claim under Title VII.  *See* Pl. Opp. at 28 n.11 ("Tieu's disability [and] pregnancy . . . claims are logically intertwined").  Even assuming that Tieu has established a prima facie case under the ADA, therefore, Defendants are entitled to summary judgment for the same reasons:  Tieu has not submitted evidence which undermines Defendants' legitimate, nondiscriminatory rationale for her disappointing performance reviews.  *See supra* Part II.A.

20

"An employer may also violate the ADA by failing to provide a reasonable accommodation." *McMillan*, 711 F.3d at 125. To establish a prima facie case based on failure to accommodate, the plaintiff must demonstrate that

> (1) [she] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*Id.* at 125–26.

Tieu alleges throughout her complaint that Defendants denied her reasonable accommodations for her high-risk pregnancy and its associated symptoms and conditions. *See, e.g.*, Compl. ¶¶ 25, 30–32, 41–43, 78–80. On summary judgment, Defendants do not contest that Tieu can establish the first three elements of the prima facie case. Def Mem. at 25. They argue, however, that Tieu cannot establish the fourth element because "she was granted each and every reasonable accommodation she requested."[8] *Id.*

The record establishes that EDC repeatedly made reasonable accommodations allowing Tieu to perform her job throughout and after her pregnancy. First, Tieu alleges that EDC denied her request to work from home for two days per week for two weeks in January 2019, while she experienced morning sickness. Compl. ¶¶ 24–25. She does not contest, however, that EDC approved an alternative accommodation allowing her to work reduced hours for three months. Def. 56.1 ¶¶ 74, 81. Under the ADA, "employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee"—the accommodation need only be "effective." *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 95 (2d Cir. 2015). Tieu alleges that the alternative accommodation was "lesser," Compl. ¶ 27, but she

---

[8] Tieu does not respond to this argument in her brief, so the Court may deem it abandoned. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").

does not allege that it was ineffective.  The Court finds that the hour-reduction accommodation was "plainly reasonable," "end[ing] the analysis."  *Noll*, 787 F.3d at 94.

Second, Tieu alleges that EDC failed to accommodate her hearing loss when Osborne "labeled Tieu 'unfit for work' and sent her home instead of permitting her to telecommute." Compl. ¶ 56.  But it is undisputed that upon receiving a note from Tieu's doctor a few days later, EDC granted Tieu's request to work from home and credited back the two vacation/sick days that she used.  Def. 56.1 ¶¶ 100, 101.  Osborne's comment and initial reaction do not negate the fact that Tieu was granted the accommodation she requested in relatively short order.  *See Logan v. Matveevskii*, 57 F. Supp. 3d 234, 257–58 (S.D.N.Y. 2014) ("A delay in implementing an accommodation does not violate the ADA . . . unless the delay was unreasonable or plaintiff has provided evidence of discriminatory intent" (citation omitted)).

Tieu also alleges that EDC denied her an accommodation when Hoyt "forced" her to sit for a deposition "eight months into her high-risk pregnancy."  Compl. ¶¶ 43, 45.  But the record tells a different story.  The record does not indicate that Tieu asked to be excused from the deposition: on the contrary, she said she would be "happy to do it" if she were not in labor. Ex. MM.  When the time came, Tieu confirmed: "I haven't gone into labor yet so I will be the witness for the deposition."  Ex. NN.  Although Tieu alleges that she "felt pressured to go," Tieu Dep. at 189:19–24, she does not allege that she asked for an accommodation or that EDC denied her request.  *See Brown v. The Pension Boards*, 488 F. Supp. 2d 395, 407 (S.D.N.Y. 2007) ("It is settled that an employee cannot hold an employer liable for failing to provide an accommodation that the employee has not requested in the first place." (citation omitted)).[9]

---

[9] Indeed, when EDC's legal department learned Tieu would be attending the deposition, they requested it be moved from Staten Island to lower Manhattan "so that Tieu would not need to take the ferry."  Compl. ¶ 43.

22

The Court finds that Defendants granted Tieu reasonable accommodations during and after her pregnancy, and she, therefore, cannot make out a prima facie case of disability discrimination.  Accordingly, Defendants' motion for summary judgment on Tieu's ADA claim is GRANTED.

III.    FMLA Interference

The FMLA allows eligible employees to take up to twelve work weeks of unpaid leave per year for the purposes specified in the statute, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  "FMLA claims come in at least two varieties: interference and retaliation." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017).  "[A]n employee brings an 'interference' claim when her employer has prevented or otherwise impeded [her] ability to exercise [her] rights under the FMLA."  *Id.*  An employee brings a retaliation claim after "actually exercising her [FMLA] rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer."  *Id.*  Plaintiff asserts both types of claims in her first cause of action.[10]  Compl. ¶¶ 115–18.

To establish a FMLA interference claim, a plaintiff must show

(1) that [s]he is an eligible employee under the FMLA; (2) that defendant is an employer as defined in the FMLA; (3) that [s]he was entitled to take leave under the FMLA; (4) that [s]he gave notice to the defendant of [her] intention to take leave; and (5) that [s]he was denied benefits to which [s]he was entitled under the FMLA.

*Achille v. Chestnut Ridge Transp., Inc.*, 584 F. App'x 20, 21 (2d Cir. 2014) (cleaned up).

---

[10] Plaintiff's FMLA retaliation claim is addressed *infra* in Part IV.

23

Tieu argues that Hoyt interfered with her FMLA rights when he initially refused to sign her leave form.  Defendants contend that Tieu "was authorized to take FMLA leave, and did, in fact, take FMLA leave," and that Hoyt's alleged comments "were entirely unrelated to her leave."  Def. Reply at 3–4, ECF No. 95.

It is undisputed that although Hoyt did not immediately sign the leave form, he did sign it less than a week later after confirming that Tieu was entitled to sixteen weeks of parental leave.  Def. 56.1 ¶ 115.  A mere administrative delay in approving a leave request does not amount to interference unless a plaintiff shows that she "was harmed as a result of the delay, and did not take FMLA days because [s]he lacked the approval."  *Dudley v. New York City Hous. Auth.*, No. 14 Civ. 5116, 2017 WL 4315010, at *23 (S.D.N.Y. Sept. 25, 2017) (cleaned up); *see also Matias v. Montefiore Med. Ctr.,* No. 20 Civ. 2849, 2022 WL 4448585, at *15 (S.D.N.Y. Sept. 23, 2022).  Tieu has presented no such evidence.

Tieu further contends that Hoyt interfered with her FMLA rights by discouraging her from taking leave, alleging that he "made disparaging remarks about Tieu's leave, telling Tieu that she was 'shirking' her responsibilities" and "'should be grateful' that a colleague" would cover for her during her maternity leave.  Pl. Opp. at 15–16.  Courts in this Circuit require a plaintiff proceeding on a "discouragement theory" to offer evidence that she "attempted to assert [her] FMLA rights but was discouraged from doing so in such a way that would have 'dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights."  *Hockenjos v. Metro. Trans. Auth.*, No. 14 Civ. 1679, 2016 WL 2903269, at *8 (S.D.N.Y. May 18, 2016) (quoting *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 535 (S.D.N.Y. 2009).  Although a defendant cannot attempt to dissuade an employee from taking FMLA-protected leave, "[c]riticizing, even berating an employee's substantive job performance is not

enough to assert a claim for interference under a discouragement theory." *Hockerjos*, 2016 WL 2903269, at \*9; *see also Hill v. New York City Hous. Auth.*, 220 F. Supp. 3d 499, 506 (S.D.N.Y. 2016) ("FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." (citation omitted)).

Here, Hoyt's criticisms were directed toward Tieu's job performance and communications with Lippman, not toward her impending leave. Hoyt's alleged outburst occurred after Tieu delegated an assignment to Lippman, which Hoyt found "inappropriate" because the two held the same role. Hoyt Dep. at 159:23–160:5, 161:9–17. In a text message sent that day, Tieu recalled Hoyt telling her: "[Lippman] doesn't work for you. She's doing you a favor. You should continue to work while you're here." Ex. TT. No reasonable jury could find that Hoyt's comments were intended to discourage Tieu from taking leave; instead, they address a performance deficiency (improper delegation) "unrelated to [her] FMLA leave." *Hill*, 220 F. Supp. 3d at 506. And although Tieu also alleges that Hoyt told her she should be "grateful" Lippman would cover for her during her maternity leave, the Court cannot find that this statement would "dissuade a similarly situated employee of ordinary resolve" from taking leave. *Cf. Golden v. New York City Dep't of Env't Prot.*, No. 06 Civ. 1587, 2007 WL 4258241, at \*2–\*3 (S.D.N.Y. Dec. 3, 2007) (holding that plaintiff did not show that his supervisor's repeated mockery of his back injury "would have deterred an employee of ordinary firmness" from requesting or taking leave).

Tieu also argues that Defendants interfered with her FMLA rights by failing to restore her to the same or an equivalent position upon her return. Pl. Opp. at 16–17. "The FMLA provides that at the end of an employee's leave the employee has the right to return to the position [s]he

held before the leave or its equivalent." *Sista*, 445 F.3d at 174 (citing 29 U.S.C. § 2614). This "restoration" right is not absolute: "If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, . . . the employee has no right to restoration to another position under the FMLA." *Id.* (quoting 29 C.F.R. § 825.216).

Tieu alleges that she "returned from leave to a different job," because she "no longer supervised anyone," "80% of her responsibilities were removed, she was only assigned short-term projects and treated as a new hire," and her second performance review "result[ed] in a lesser raise." Pl. Opp. at 17. The Court need not decide whether these purported alterations to Tieu's job are actionable, however, because Tieu was undisputedly unable to return to her position after the end of her twelve-week FMLA leave. *See* Def. 56.1 ¶¶ 231, 234 (stating that Tieu's FMLA-covered leave ended on October 25, 2019, and Tieu requested a leave extension through March 4, 2020). The FMLA, therefore, "did not entitle [Tieu] to be restored to [her] former position or to any other position." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161 (2d Cir. 1999).

Accordingly, Defendants' motion for summary judgment on Tieu's FMLA interference claim is GRANTED.

IV.   <u>Retaliation</u>

Claims One, Three, Five, and Eleven of the complaint allege that Defendants retaliated against Tieu for activities protected by the FMLA, Title VII, the ADA, and Section 1981, respectively. *See* Compl. ¶¶ 115–18, 124–28, 134–38, 163–66. These statutes all contain similar anti-retaliation provisions, which are likewise analyzed under the *McDonnell Douglas* burden-shifting framework. *See Littlejohn*, 795 F.3d at 315 (Title VII and § 1981); *Treglia v. Town of*

*Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (ADA); *Millea v. Metro-N. R.R.*, 658 F.3d 154, 164 (2d Cir. 2011) (FMLA).  To establish a prima facie case of retaliation, plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Littlejohn*, 795 F.3d at 316.  The burden then shifts to the employer "to demonstrate that a legitimate, non-discriminatory reason existed for its action." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).  If the employer demonstrates such a reason, the burden shifts back to the plaintiff "to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation."  *Id.* at 129.  "[A] plaintiff alleging retaliation in violation of Title VII must show at the final step of the analysis that retaliation was a 'but-for' cause of the adverse action, not simply a 'substantial' or 'motivating' factor in the employer's decision."  *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013)); *see also Georges v. Peters*, 581 F. App'x 80, 81 (2d Cir. 2014) (same for Section 1981); *Heiden v. N.Y.C. Health & Hosps. Corp.*, No. 20 Civ. 10288, 2023 WL 171888, at *21 (S.D.N.Y. Jan. 11, 2023) (same for the ADA).  Under the FMLA, the plaintiff must establish that the exercise of FMLA rights was a "motivating factor" in the adverse employment action.  *See Woods*, 864 F.3d at 166.

   A.  Prima Facie Case

   Defendants do not dispute that in seeking accommodations, taking FMLA leave, and submitting various discrimination complaints to EDC, Tieu engaged in protected activity.  *See* Pl. Opp. at 20, 29 (listing protected activities); *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002) (seeking an accommodation is a protected activity under the ADA);

*Amin v. Akzo Nobel Chemicals, Inc.*, 282 F. App'x 958, 961 (2d Cir. 2008) ("Informal

complaints to management as to discrimination on a basis prohibited by Title VII are protected

activity.").  Nor do they contest that Defendants knew of her protected activity.  Tieu has,

therefore, met the first two elements of the prima facie case.

On the third element, a plaintiff "must show that a reasonable employee would have

found the challenged action materially adverse."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548

U.S. 53, 68 (2006).

> The scope of actions that may be materially adverse for purposes of a Title VII
> retaliation claim is broader than those actions prohibited by Title VII's anti-
> discrimination provisions; the latter apply to the terms and conditions of
> employment, while the former anti-retaliation protection is broader and extends
> beyond workplace-related or employment-related retaliatory acts and harms.

*Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 118 (S.D.N.Y. 2022) (quotation marks and

citation omitted).  Still, "even in the retaliation context, 'it is important to separate significant

from trivial harms.'"  *Id.* (quoting *Burlington*, 548 U.S. at 68).

For the reasons stated above, Tieu's two disappointing performance reviews and the "80

percent" reduction of her workload constitute adverse employment actions.  *See* Part II.A.1.i.

However, the other allegedly retaliatory actions—including assigning her no direct reports,

Compl. ¶ 91; "ignor[ing]" one of her emails regarding her benefits, *id.* ¶ 92; requiring her to

attend "two-on-one weekly meeting[s]," *id.* ¶ 100; and requiring her to "go through trainings and

orientations that she has already attended," *id.* ¶ 98—do not rise above the level of "trivial

harm."  *Alvarado*, 631 F. Supp. 3d at 118.  Tieu also suggests that Defendants retaliated against

her by failing to transfer her to another unit.  *See* Compl. ¶ 97.  But, Tieu concedes that she never

formally applied for a transfer, as required by EDC's internal policy.  Def. 56.1 ¶¶ 270–73.

28

On the fourth element, Tieu must show a causal connection between the adverse employment actions and her protected activities. Tieu argues that the timing of the events, Loeb and Hoyt's "negative comments" about her, "pretext," and the "obviously flawed investigation[s]" into her complaints establish the causal connection. Pl. Opp. at 19–25. As described above, Tieu has shown that the adverse actions at issue followed her requests for accommodations, a protected activity under the ADA. And, the second performance review and reduction in workload occurred after Tieu requested additional accommodations and made several formal and informal complaints of discrimination. *See, e.g.*, Pl. 56.1 ¶¶ 48, 51, 52, 58. "Given that the burden for establishing a prima facie case of retaliation is de minimis," the Court assumes for the purposes of this motion that Tieu has established a sufficient causal connection. *Hornig v. Trustees of Columbia Univ.*, No. 17 Civ. 3602, 2022 WL 976267, at *23 (S.D.N.Y. Mar. 31, 2022) (internal quotation marks and citation omitted).

### B.  Nonretaliatory Justifications and Pretext

As with Tieu's discrimination claims, Defendants have pointed to legitimate, nonretaliatory reasons for the performance reviews and reduced workload: Tieu's communication skills needed improvement, and her three-day-per-week schedule justified reassignment of some of her projects. *See supra* Part II.A.2. Accordingly, the "presumption of retaliation dissipates," and the burden shifts back to Tieu to establish "that the desire to retaliate was the but-for cause of the challenged employment action." *Hornig*, 2022 WL 976267, at *23 (quoting *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015)). At this stage, "temporal proximity between a protected [activity] and an adverse employment action is insufficient to satisfy plaintiff's burden to bring forward some evidence of pretext." *Ya-Chen Chen*, 805 F.3d at 72 (cleaned up).

First, Tieu points to two allegedly discriminatory comments.  The Court has already discussed why Hoyt's alleged comment about Tieu "shirking" her work does not suffice to show pretext.  *See supra* Part II.A.3.  Tieu also cites an April 30, 2020 text message from Loeb to Hoyt and Stein, which reads:

> I know you got the news about Lia.  We will discuss at our check in.  I am here to support you in every way possible.  I know this is not the outcome any of us wanted or expected.  And I made it clear I will not jeopardize the amazing work that you two have established with the team or Sabrina's relationship with key tenants.

ECF No. 84-6.  Tieu speculates that the text refers to the "news" that she would be returning from leave.  Pl. Opp. at 23–24.  Loeb testified, however, that she was referring to Tieu's decision to "fil[e] a federal complaint against EDC and individuals."  Loeb Dep. at 160:9–161:3, Ex. A, ECF No. 79-1.  Although the Court is required to draw reasonable inferences in favor of the plaintiff, a conflict between sworn testimony and conjecture is insufficient to create a genuine issue of fact.  *See Ghirardelli v. McAvey Sales & Serv., Inc.*, 287 F. Supp. 2d 379, 391 (S.D.N.Y. 2003).

Second, Tieu argues that that Defendants' reasons for the negative reviews are pretextual because Hoyt and Loeb "hardly worked with Tieu," and Lauren Wolf, "the employee who worked most closely with Tieu, provided overwhelmingly positive feedback."  Pl. Opp. at 24.  But Tieu does not contest that she reported to Hoyt, *see* Ex. TTT, ECF No. 79-73, or that Wolf's feedback was incorporated into her performance reviews.  *See, e.g.*, Ex. QQ (performance review noting that Hoyt "received positive feedback from internal colleagues about Lia's communications with them on projects, especially Lauren Wolf").  The fact that Wolf did not deliver Tieu's performance reviews does not establish that Defendants' reasons for their scores were pretextual.

Finally, Tieu argues that the "obviously flawed investigation" into her complaints were a "transparent effort to exonerate Hoyt." Pl. Opp. at 24–25. Tieu claims that EDC's EEO investigators "tried to convince Tieu that her diminished performance rating was not negative," "declined to seek out potential witnesses," and misquoted Tieu in the final report. *Id.* Even accepting all of Tieu's allegations as true, however, "a faulty investigation is not in and of itself evidence of pretext." *Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 250 (N.D.N.Y. 2010). Here, the record shows no evidence that "deficiencies in [EDC's] investigation and/or the incorrect conclusion reached . . . can be attributed to a discriminatory motive." *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 188 (E.D.N.Y. 2008). The 2019 investigation report indicates that Vasquez and Edwards-O'Neal interviewed both Tieu and respondents Hoyt and Kwatinetz, and reviewed relevant emails, text messages, and promotion records. *See* Ex. AAA. Moreover, the 2021 report notes that Santiago interviewed Hoyt, Stein, Wolf, and another employee about Tieu's communication skills in connection with her second performance review. Ex. EEEE. Although Tieu suggests that unspecified "witnesses" would have been able to support her claims, Pl. Opp. at 24, "[it] is not the Court's role to . . . question the manner in which [an employer] conducts its internal investigations, . . . or determine whether the employer's actions were justified." *Koppar v. Orange Reg. Med. Ctr.*, No. 19 Civ. 11288, 2022 WL 348172, at *18 (S.D.N.Y. Feb. 2, 2022) (citation omitted). Again, although Tieu may disagree with the results of the investigations, she offers no evidence to demonstrate that "the manner in which the investigation[s] [was] conducted . . . was discriminatorily motivated, which is fatal to [her] claim." *Id.* (citation omitted).

Accordingly, Defendants' summary judgment motion as to Tieu's FMLA, Title VII, Section 1981, and ADA retaliation claims is GRANTED.

31

SPA-32

V.      State Law

Finally, Tieu brings claims under the NYSHRL and the NYCHRL.  Compl. ¶¶ 139–58.

Having granted summary judgment to Defendants on all of the Tieu's federal claims, however,

the Court declines to exercise supplemental jurisdiction over these state-law claims.  *See* 28

U.S.C. § 1367(c)(3); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("[W]here

the federal claims are dismissed before trial, the state claims should be dismissed as well.").

Accordingly, those claims are DISMISSED without prejudice to renewal in state court.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is directed to terminate the motion at ECF No. 78, enter judgment consistent

with this order, and close the case.

SO ORDERED.

Dated: February 13, 2024
       New York, New York

_____
            **ANALISA TORRES**
      **United States District Judge**

32

SPA-33

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

LIA TIEU,

                    Plaintiff,                      21 **CIVIL** 5951 (AT)

     -v-                                      **JUDGMENT**

NEW YORK CITY ECONOMIC
DEVELOPMENT CORPORATION,
WINTHROP HOYT and RACHEL LOEB, in
their individual and professional capacities,

                    Defendant.
-----------------------------------------------------------------------X

      It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Stipulation and Order dated February 12, 2024, Defendants motion for

summary judgment is GRANTED. Accordingly the case is closed.

**Dated:** New York, New York

      February 13, 2024

                                      **RUBY J. KRAJICK**
                                    **Clerk of Court**

                   **BY:**          _____

                                     **Deputy Clerk**